1    James M. Cool, State Bar No. 028023
    **Frazer, Ryan, Goldberg & Arnold, L.L.P.**
2    1850 North Central Ave., Suite 1800
    Phoenix, Arizona 85004
3    Telephone: (602) 277-2010
    Facsimile: (602) 277-2595
4    Email: jcool@frgalaw.com
         bmontano@frgalaw.com
5
    Jayesh Patel, CA State Bar No. 132939 (Pro Hac Vice Pending)
6    **Norton Rose Fulbright US LLP**
    555 South Flower Street
7    Forty-First Floor
    Los Angeles, California  90071
8    Telephone:    (213) 892-9200
    Facsimile:    (213) 892-9494
9    Email: jayesh.patel@nortonrosefulbright.com
         silvia.cerna@nortonrosefulbright.com
10
    Attorneys for Plaintiff
11    BAKEMARK USA, LLC

12                IN THE UNITED STATES DISTRICT COURT

13                FOR THE DISTRICT OF ARIZONA

14

15    BAKEMARK USA, LLC,                    | No:

16              Plaintiff,                  | _____

17    v.

18    CAROLYN "ROMY" PASTIS; and DOES       | **VERIFIED COMPLAINT FOR**
    1 THROUGH 10, inclusive,                | **INJUNCTIVE RELIEF**
19
              Defendants.
20

21

22        Plaintiff BakeMark USA LLC ("BakeMark"), as and for its Complaint against

23    Defendant Carolyn "Romy" Pastis ("Defendant" or "Pastis"), hereby alleges as follows:

24                **NATURE OF THE ACTION**

25        1.    This is an action to enjoin the Defendant from continuing to publish

26    confidential business information and false and inflammatory statements of claimed

27    improprieties and invented "illegalities" by BakeMark aimed at both Defendant's former

28

1  employer and its customers and investors.

2      2.    Plaintiff BakeMark is a corporation that manufactures and sells baking

3  products, ingredients, and supplies. It provides a wide variety of baking necessities such

4  as flour, sugar, butter, mixes, and decorations to mom-and-pop bakeries, recognized

5  franchises, catering services, and confectionaries across the United States and Canada.

6      3.    Defendant Pastis is a former employee of  BakeMark who, in spite of having

7  pursued employment-related grievances before the National Labor Relations Board

8  (NLRB) that remain pending, has resumed a web-based campaign disclosing BakeMark's

9  confidential information and making knowingly false and inflammatory statements

10  against BakeMark, its customers and its investor.

11      4.    BakeMark now seeks to enjoin Pastis from continuing to broadcast

12  confidential information and falsehoods that are injurious to BakeMark, its customers and

13  its investors, and to compel her to remove them.

14                  **THE PARTIES**

15      5.    Plaintiff BakeMark is a Delaware LLC with its principal place of business at

16  7351 Crider Ave, Pico Rivera, CA 90660.  BakeMark has an Arizona distribution facility

17  located at 2625 S. Roosevelt St, Tempe, Arizona 85282 (the "Tempe Facility,").  Pastis

18  was employed as a senior buyer in the Tempe facility.

19      6.    Defendant Pastis is an adult resident of the state of Arizona and a citizen of

20  the United States of America.  At times material hereto, Defendant Pastis  was a senior

21  buyer in BakeMark's Tempe Facility, but resigned her employment on July 17, 2023.

22  Upon information and belief, Defendant Pastis is currently unemployed and lives at 15598

23  North Hidden Valley Lane, Peoria, Arizona 85832.

24

25              **JURISDICTION AND VENUE**

26      7.    This Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332

27  because Plaintiffs and Defendants are of diverse citizenship and value of the injunctive

28  relief sought, and of the claims to be brought in arbitration, exclusive of interests and

1  costs, exceeds $75,000.

2      8.    Venue is proper in this federal judicial district pursuant to 28 U.S.C.

3  §1391(a), (b)(2) and/or 1400(a) because a substantial part of the events or omissions

4  giving rise to the causes of action in this case occurred in this judicial district.

5      9.    This court has personal jurisdiction over Defendant because Defendant is a

6  resident of the State of Arizona, and all of the events giving rise to this action occurred in

7  the State of Arizona.

8  **FACTUAL ALLEGATIONS**

9  **I.    Plaintiff BakeMark Seeks to Protect its Confidential Information, Customers,**

10  **Employees, and Investors**

11      10.    BakeMark is a California-based baking goods supply firm focused

12  principally on delivering baking products and supplies such as flour, sugar, butter, fillings,

13  and mixes, including custom proprietary mixes, to bakeries and retail enterprises to use

14  for products sold to the general public across the United States and Canada.

15      11.    BakeMark operates 6 manufacturing plants and 33 distribution centers

16  across the United States and Canada and through this vast network services thousands of

17  bakery operations, from mom-and-pop bakeries to grocery stores and nationally

18  franchised household names.

19      12.    In 2021, Clearlake Capital Group, L.P. ("Clearlake"), a private investment

20  firm, made a substantial capital investment in BakeMark.

21      13.    BakeMark endeavors to safeguard its reputation in the industry and among

22  consumers in order to protect its employees, customers, and investors.

23  **II.    Defendant's Employment and Contractual Obligations**

24      14.    Pastis was hired on January 28, 2021 as a senior buyer in BakeMark's

25  Tempe, Facility. Her essential job duties included, among others:

26      a.  Managing inventory of products and commodities from assigned vendors;

27      b.  Ensuring that the products and commodities meet BakeMark quality

28         specifications, and taking corrective action to address defective goods;

    c.  Preparing and placing purchase orders;

    d.  Tracking actual and market cost changes for products and commodities;

    e.  Ensuring that the budget and financial targets are met;

    f.  Effectively communicating with sales, accounting, and the warehouse to ensure proper inventory and cash flow; and

    g.  Treating customers, vendors, and colleagues with respect, courtesy, and kindness.

**See. Exhibit. 1,** March 3, 2023 Correspondence with NLRB, at 3.

15.    When Pastis initially became employed by BakeMark, she agreed to be bound by an employment agreement (the "Agreement"). The Agreement contained confidentiality provisions and a return of materials provision.  See **Exhibit 2**, Pastis Agreements with BakeMark at 6-7.

16.    Pursuant to paragraph 4 of the Agreement, Pastis agreed that she would not disclose BakeMark's Confidential Information, as defined in Section 4(a), unless authorized by an officer, required by law, or in furtherance of her duties with BakeMark. *Id.*

17.    Paragraph 4(a) defined "confidential information" as "trade secrets (as defined by applicable law) or other confidential and proprietary information relating to the Company's customers, manufacturing, products, services, pricing and sales, research, business, practices [or] procedures . . . that Employee becomes privy to by virtue of employment with [BakeMark]."  This definition included "(ii) information about [BakeMark's] internal methods of operation and manufacturing…" and "(iii) information about the companies . . . practices and strategies . . . [BakeMark's] suppliers . . . ; and non-published financial information relating to [BakeMark's] income, budgeting, cost structures, expenses, profits, and general financial standing." *Id.*

18.    The obligations in Paragraph 4 apply for five years after Defendant's separation from BakeMark, unless the information is a trade secret, in which case the obligation continued as long as the trade secret remains protected under applicable laws.

DOCUMENT PREPARED ON RECYCLED PAPER

1  *Id.*

2        19.    Paragraph 5 of the Agreement contains a "Return of Materials" provision,

3  pursuant to which Pastis agreed that, when she left BakeMark, she would "deliver to

4  [BakeMark] all of [BakeMark's] materials, documents, plans, records, notes, drawings, or

5  papers and any copies thereof (whether electronic or hard copy)" that Pastis had in her

6  possession or control and that "pertain[] to [BakeMark's] business." *Id.*

7        20.    Furthermore, Pastis agreed to "refrain from accessing any Confidential

8  Information stored on any personal computer, email account, tablet, smartphone,

9  electronic storage device or web-based data storage account or service," and to inform

10  BakeMark if she had any access to such information and, "upon direction from

11  [BakeMark], … [to] permanently delete and erase any Confidential Information stored on

12  such device…" *Id.*

13  **III.    Defendant Makes Internal Complaints In 2022 That Are Fully Investigated**

14  **And Rebutted**

15        21.    Pastis performed her job well for more than a year before her performance

16  and her relationships with her coworkers, teammates, superiors, and the overall

17  organization deteriorated.  **Ex. 1 at 6**.

18        22.    In or about May 2022, Ms. Pastis sent a "report" filled with a series of

19  allegations about both the operations of the Tempe branch and her co-workers, to

20  Rosemarie Gomez, BakeMark's head of Human Resources, and Nasser Affarka,

21  BakeMark's Manager of Internal Controls. This 32-page "report" expressed two chief

22  claims concerning supposed safety issues with BakeMark's products (setting aside for

23  purposes of this complaint the additional and debunked charges in the report against Ms.

24  Pastis' co-workers[1]):

25        a.  First, Pastis generally alleged that BakeMark was keeping goods in storage

26

27  [1] Pastis's "report" also included various allegations ranging from complaints about her
Branch's inventory and service level numbers to salacious allegations about Pastis's

28  coworkers/ BakeMark thoroughly investigated each of these claims, some before Ms.
Pastis even raised them, and addressed them as required.

1    beyond their expiration dates and selling them to customers.

2        b.    Second, she alleged that BakeMark was selling products that showed signs

3            of pests on the exterior of the packaging.

4    **Ex. 1** at 4

5        23.    In mid-2022, Pastis also first submitted several photographs and claims to

6    BakeMark, asserting "illegal" activity at that time.  **Exhibit 3,** December 5, 2023

7    Correspondence with NLRB, at 1.

8        24.    Pastis claimed that the unauthenticated and unverified photographs showed

9    bug-infested inventory at BakeMark's Tempe Distribution Center.

10        25.    In response, BakeMark requested an inspection by the Maricopa County

11    Environmental Service Department's Health Division, which issued BakeMark an "A"

12    rating in response to those claims in November 2022.  **See Ex. 3, at 1.**

13        26.    Pastis's allegations about the sale of "expired" goods are entirely unmoored

14    from reality.  While, Pastis was well aware of this, upon receiving Pastis' "report" in

15    2022, at that time BakeMark nevertheless explained to her the falsity of those allegations

16    with demonstrative information about the relevant standards for "best buy" guidance

17    drawn from government regulations, as well as established protocols and systems within

18    BakeMark that address usage, prioritization, and disposition of its inventory including the

19    disposal of any stale goods.  **Ex. 1 at 6.**

20        27.    Pastis's allegations about pest infestation are similarly meritless as was

21    explained to her in 2022 following her "report."  All companies in the food supply chain

22    face the challenges of pest infestation for materials delivered on nationwide shipping

23    networks.  That does not lead to the false assertions made by Pastis.  BakeMark has

24    specific processes and procedures, all of which Pastis was aware and of which she was

25    reminded in 2022 following her "report," to ensure that its products comply with all food

26    safety and health regulations.  Pastis repeatedly told that BakeMark does not remotely

27    engage in the conduct claimed by Pastis.  In fact, before, during and after Pastis'

28    employment, the Tempe Facility has repeatedly received "A" ratings from the relevant

governmental inspecting agencies for their products, processes and facility cleanliness and regulatory compliance.  See **Exhibit 4** Maricopa County Health Inspections

*Internal and Independent Investigations Disproved Defendant's "Written Allegations"*

28.    In 2023, Ms. Pastis, *using the same photographs and claims*, prompted yet another health inspection, again at BakeMark's request, by the Maricopa County officials,. BakeMark again achieved an "A" rating.  See **Ex. 3 at 1**

29.    The results of both the internal and independent investigations were clearly explained to Ms. Pastis by Ms. Gomez and Mr. Affarka in a number of meetings and largely confirmed what Ms. Pastis already knew: BakeMark's storage and sale of its products are fully compliant with company policy and all applicable food-safety laws, and that the rumors concerning her co-workers were unfounded.

30.    As to the alleged inventory errors, BakeMark put in place an updated policy and a specific team to address and resolve any issues moving forward.  **Ex. 1** at 4-5

31.    As a senior buyer, Ms. Pastis was (or should have been) aware of the facts which squarely contradict the primary allegations in her "report."  Included in the report was an email between Ms. Pastis and Mr. Affarka, BakeMark's Manager of Internal Controls, in which the latter told Ms. Pastis that while he raised her concerns about the products with corporate, "there is nothing illegal" about BakeMark's purchase, storage, sale, or use of the products.

**IV.    Pastis Initiates Two NLRB Actions**

32.    Both before and after resigning from BakeMark in July, 2023, Pastis submitted complaints to the NLRB, alleging that BakeMark took adverse actions against her "because she raised concerted complaints to the Employer concerning unethical business practices affecting employees; employee bonuses; and/or the lack of COVID related safety protocols including providing notifications to employees about exposure." While BakeMark has provided the NLRB with detailed factual responses and denials to these allegations, see **Ex. 1.,** this dispute paints the backdrop against which BakeMark

DOCUMENT PREPARED
ON RECYCLED PAPER

1    brings its current request.

2    **V.    Defendant Defames BakeMark, Removes Her Post, And Then Broadens Her**

3    **Campaign of Disparagement To Include Innocent Third Parties**

4    *Defendant's Initial Statements*

5    33.    On or around February 7, 2023, several months after filing her first NLRB

6    Complaint, Pastis published, to her LinkedIn, accusations of the same "illegal" activity

7    she had raised with BakeMark in 2022.

8    34.    In that LinkedIn post, Pastis accused BakeMark of "cook[ing] the books"

9    and "forg[ing] legal documents !" and accompanied her accusation with "#legal #fraud

10    #forgery Federal Bureau of Investigations (FBI) Clearlake Capital Group."

11    35.    Pastis's reference to "cooking the books" is a refrain in her baseless

12    statements of accounting impropriety.  Pastis's role at BakeMark did not change between

13    her initial accusations and the time that these statements were published.  Her job did not

14    require or utilize knowledge of generally accepted accounting principles, nor was she

15    made privy to any of BakeMark's "books."  Furthermore, it remains entirely unclear what

16    "legal documents" Pastis claims were forged.

17    36.    Pastis, in her role as senior buyer, would have had absolutely no personal

18    knowledge of or access to BakeMark's accounting practices or procedures, let alone the

19    relationship or nature of interaction between the company and Clearlake Capital Group. If

20    she had, it would be a violation of her Agreement to disseminate such information.

21    37.    On February 14, BakeMark demanded that Pastis remove the post and

22    provide BakeMark with any factual information underpinning the post.

23    38.    On February 17, Pastis agreed to remove the post and commenced

24    settlement negotiations ***without ever providing BakeMark with any evidence to support***

25    ***her February 7th comments***.

26    39.    On July 17, 2023 Pastis resigned from BakeMark.

27    *Defendant's Renewed Campaign*

28    40.    On or around October 11, Pastis began soliciting funds for a GoFundMe,

which she linked to an X.com[2] posting alongside the hashtag "#clearlakecapital."

41.     On July 24, 2023, Pastis filed a supplementary claim with the NLRB.

42.     By November 22, 2023, the NLRB issued an inquiry into BakeMark and by the following week had revived her defamatory campaign against BakeMark.  **Exhibit 5,** November 22, 2023 Correspondence from NLRB.

43.     On or around November 30, 2023, Pastis published another series of defamatory statements on LinkedIn.

44.     Pastis flatly misrepresented that BakeMark sells "infested" product and claimed that the photos she provided "[didn't] even scratch the surface of the documentation [she] [has]!"  Pastis accompanied this accusation with images which she claimed showed infested product at a BakeMark facility.  Pastis also posted a photograph of her computer screen showing a folder full of .pdf documents with titles like "09-13-22 email Bugs7.pdf" or "10-10-22 email Shady credit, no response1.pdf." purportedly to demonstrate all of the "documentation" she had supporting her claims.

45.     Later that day, Pastis published to LinkedIn an alleged recounting of her interactions with BakeMark and Clearlake Capital Group (Clearlake), an investor in BakeMark. In that post, Pastis alleged that she had called Clearlake's customer service lines as well as a VP of Client Services at the firm to attempt to "initiate movement" in her cases.  Pastis's post repeated her falsehoods that BakeMark was "overstating" inventory values and shipping "insect-infested truckloads."

46.     To that same post, Pastis attached screenshots of two reviews from Glassdoor, one of which, apparently posted on November 14, 2023, nearly perfectly mirrors her own LinkedIn posts.

47.     Finally, but also on November 30, 2024, Pastis posted "Part 3" of her disparagement of BakeMark.  In this post she maintained, again without any factual basis, that BakeMark "mishandle[s] and misrepresent[s] inventory to a pathological degree," "routinely commit[s] rampant inventory and accounting fraud," repeating her

---

[2] Formerly Twitter.com

DOCUMENT PREPARED
ON RECYCLED PAPER

misstatements about BakeMark supposedly shipping "infested inventory" and receiving "multiple TRUCKLOADS" in resulting returns and refusing to throw away "EXPIRED" inventory.

48.    Pastis published many of the same images as she did on LinkedIn to her Facebook account over a series of posts made around the same timeframe.

49.    Because Pastis made absolutely no effort to limit the scope of her statements, her "accusations" do not only impugn the integrity of the team she resigned from, but call into question the integrity of BakeMark's operations from coast to coast and in effect slanders the hundreds of employees that work hard to ensure that BakeMark supplies wholesome products to its customers, who are in turn trusted by the public and rely on BakeMark to help sustain that relationship of trust..

*Pastis Interferes with BakeMark's Relationships with Customers and Violates Her Own Contractual Agreements*

50.    BakeMark has a variety of contractual relationships with national retail bakery brands.

51.     In her role as senior buyer, Pastis was made privy to some of BakeMark's customers and customer base, which information she had a contractual duty and obligation to keep confidential.

52.    On or around December 14, 2023 Pastis began publishing attacks aimed at BakeMark's customers despite her contractual obligation to hold safe "confidential… information relating to [BakeMark's] customers" which would include information about which products particular customers purchase from BakeMark.  **Ex. 2 at 6.**

53.    On December 14, Pastis tagged Krispy Kreme Doughnuts and Clearlake Capital Group in a Facebook post in which she published images claiming to show infested BakeMark products in an apparent effort to either call her allegations to their attention or to imply that BakeMark's investors and customers are somehow complicit with the misconduct that she has persistently alleged.

54.    In another December 14 post, under the heading "Let's talk about

Document Prepared on Recycled Paper

BakeMark, Krispy Kreme Doughnuts[3] & product quality . . ," Pastis claimed that BakeMark "illegally" refused to "track fumigation" of product apparently sold to Krispy Kreme and posted highlighted images of contracts between Krispy Kreme and BakeMark, demonstrating non-compliance with her duties to return BakeMark Information. Alongside the Krispy Kreme contracts, Pastis also included images of internal communications she had had with BakeMark employees refuting her allegations but again in violation of her confidentiality agreements.

55.    The photos and allegations supporting this post were a recycled version of those same refuted points she had been raising for over a year, with the added twist of bringing a customer into the fold all the while knowing her statements to be false and disproven.

56.    At all times, from the initial posts to the ones directly implicating customer relationships, Pastis has been aware, due to her knowledge gained as a Senior Buyer for BakeMark, as well as the results of the internal and external investigations into her written allegations (along with the accompanying photographs) that her accusations of impropriety were false.

**IV.    Defendant's NLRB Action**

57.    Ostensibly to address her personal claims, Pastis has filed two charges against BakeMark with the National Labor Relations Board (the "NLRB"). Each charge— filed in February and November 2023, respectively—contains the same knowingly false and disproven allegations and the same recycled claimed "evidence" regarding BakeMark's food safety practices.  *See, e.g.*, **Exhibit 6** February 7, 2023 Correspondence from NLRB, and **Ex. 5.**  Despite being completely meritless, Pastis is promoting her filing of these charges on social media.

<u>**FIRST CAUSE OF ACTION**</u>

**DEFAMATION PER SE**

---

[3] The language "Krispy Kreme Doughnuts" was in fact a "tag" linking to Krispy Kreme's page.

DOCUMENT PREPARED ON RECYCLED PAPER

58.    BakeMark repeats and realleges all of the allegations contained in Paragraphs 1-57 above as though fully set forth herein.

59.    Defendant Pastis published onto her public social media pages statements impugning BakeMark's quality of goods and business practices.

60.    At all times, Pastis knew that these allegations were false, because they had already been investigated and found to be baseless in reports made known to her.

61.    In making these posts despite knowing that the allegations therein were false, Defendant Pastis acted in reckless disregard for the truth.

62.    In making these posts, Pastis painted herself as a "whistleblower" who was seeking to expose facts and real happenings at BakeMark.

63.    As a direct and proximate result of Defendants repeated, willful, and ongoing defamatory statements, BakeMark has been, and will be further injured, in an amount subject to proof at arbitration, but no less than $75,000.

64.    As a direct and proximate result of Defendant's defamatory statements, BakeMark's employees, customers, and investors are at risk of grievous financial injury.

## SECOND CAUSE OF ACTION

## BREACH OF CONTRACT

65.    BakeMark repeats and realleges all of the allegations contained in Paragraphs 1-64 above as though fully set forth herein.

66.    In her various LinkedIn posts, Pastis published various internal communications among BakeMark personnel.

67.    In Pastis's posts, she also made public certain of BakeMark's confidential internal policies.

68.    In her posts, Pastis revealed confidential information about BakeMark, its operations, its proprietary processes and methods, its capital relationships, and its customers learned in the context of her employment.

69.    By making public these internal communications and policies, Pastis breached the provisions in Paragraph 4 of the Agreement.

DOCUMENT PREPARED ON RECYCLED PAPER

70.     In her posts on December 14, months after her separation from BakeMark, on Facebook, Pastis posted agreements between BakeMark and Krispy Kreme.

71.     By retaining documentation such as, but not limited to, the Krispy Kreme contracts, without disclosing that retention to BakeMark Pastis breached the provisions in Paragraph 5 of the Agreement.

72.     BakeMark has performed all of its conditions, covenants, and promises under the Agreement.

73.     BakeMark is permitted to seek a temporary restraining order and preliminary injunction from this court, and costs associated with them, under the express terms of the Agreement, in particular Paragraph 12.

74.     BakeMark will suffer irreparable harm if this court does not enter an injunction because BakeMark will continue to receive reputational harm and be put at a competitive disadvantage by having its confidential information improperly taken, used, and shared.  Furthermore, according to the express terms of the Agreement at Section 12, Pastis agreed that any violation of the Agreement will cause BakeMark to "suffer irreparable damage."

75.     As a direct and proximate result of the Defendant's repeated, willful, and ongoing breaches of the Agreement, BakeMark has been, and will be further injured, in an amount subject to proof at arbitration, but no less than $75,000.

76.     Accordingly, BakeMark seeks a temporary restraining order and preliminary injunction barring the Defendant from their continued wrongful conduct towards BakeMark during the pendency of arbitration.

///

///

///

///

///

///

DOCUMENT PREPARED ON RECYCLED PAPER

1

## **PRAYER FOR RELIEF**

77.     WHEREFORE, Plaintiff BakeMark respectfully requests:

78.     On the First Cause of Action, against Defendant Pastis, a temporary restraining order, preliminary injunction, and permanent injunction to enjoin Defendant Pastis from leaving her defamatory accusations posted on her social media pages as well as from making any further false allegations against BakeMark, its investors, employees, or customers.


Dated: December 21, 2023          **FRAZER, RYAN, GOLDBERG & ARNOLD, L.L.P.**
                                  JAMES M. COOL

                                  By   _/s/ James Cool_____
                                  JAMES M. COOL
                                  Attorneys for Plaintiff
                                  BAKEMARK USA, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I, Rosemarie Gomez, declare:

I am the Director of Human Resources for Plaintiff BakeMark USA, LLC ("BakeMark"), and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the Verified Complaint for Injunctive Relief and know its contents.

The information provided therein is based on either my personal knowledge or knowledge based on my use of BakeMark's HR systems of record in the ordinary course of my employment and my review of BakeMark's HR business records. To the best of my knowledge, information and belief, the facts stated in the foregoing document are true and correct.

I declare under penalty of perjury under the laws of the states of California and Arizona that the foregoing is true and correct.

Executed on December 20, 2023, at Los Angeles, California.

*Rosemarie Gomez*
Rosemarie Gomez (Dec 20, 2023 12:51 PST)

ROSEMARIE GOMEZ

# EXHIBIT 1

March 3, 2023

**Via NLRB Online Portal**

NORTON ROSE FULBRIGHT

Norton Rose Fulbright US LLP
555 South Flower Street
Forty-First Floor
Los Angeles, California  90071
United States of America

Direct line +1 213 892 9265
phillip.ditullio@nortonrosefulbright.com

Tel +1 213 892 9200

Field Attorney Katherine T. King-Walker
National Labor Relations Board, Region 28
2600 North Central Avenue, Suite 1400
Phoenix, Arizona 85004-3099

Re:    BakeMark USA, LLC
       Case 28-CA-309585

Dear Ms. King-Walker:

Pursuant to your request, we are providing information and responsive documents on behalf of our client, BakeMark USA, LLC ("BakeMark" or the "Respondent"), in response to your February 7, 2023 letter in the above-captioned investigation into unfair labor practice allegations by Carolyn "Romy" Pastis (the "Charge"). (*See* Exhibit A.) The Charge requested this information and accompanying documents be provided on February 24, 2023; however, on February 17, 2023, you agreed to extend that deadline to March 3, 2023. (*See* Exhibit B.) In addition to this position statement, BakeMark has provided documents in response to the Charge which are contained within Exhibit C and bates-stamped BakeMark/Pastis000001 – BakeMark/Pastis000241.

The Charge claims that Ms. Pastis was disciplined because she raised complaints to BakeMark concerning (1) supposedly unethical business practices affecting employees, (2) employee bonus payments, (3) alleged lack of COVID-related safety protocols, including providing notifications to employees about exposure, and (4) maintaining overly broad and/or discriminatory provisions in its employee handbook. Each of these allegations is unfounded, overbroad, and lacking any specificity or evidentiary basis, and BakeMark respectfully requests that the Charge be dismissed.

I.     **BakeMark's Policies and Procedures are Compliant with Applicable Law**

BakeMark is a leader in the bakery supply industry, delivering a complete line of bakery mixes, fillings and icings, glazes, frozen goods, ingredients, and other baking supplies to customers through six manufacturing facilities and over 33 distribution centers. Many of BakeMark's products are non-perishable and created to have long shelf-lives so both professional and amateur bakers can store and safely use the products over time. BakeMark highly values its relationships within the company and with its customers, and so it requires each of its employees to uphold the high standards of personal and professional integrity.

To ensure its employees meet these standards, BakeMark requires adherence to a number of policies and procedures set forth in its employee handbook. Ms. Pastis alleges that a number of these policies violate Section 8(a)(1) of the National Labor Relations Act (the "Act"). Ms. Pastis' claims are based on an intentionally narrow reading of snippets of these policies taken out of context. BakeMark addresses the relevant policy provisions below.

First, BakeMark's Code of Business Ethics and Conduct details the manner in which employees may report violations of company policies or the law and provides a fraud hot line to report such

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.                                    134927714.1

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

Katherine T. King-Walker
March 1, 2023
Page 2

NORTON ROSE FULBRIGHT

violations. Violations may also be reported to the Manager of Internal Controls. The code also makes clear that retaliation against an employee who, in good faith, reports violations is strictly prohibited and the offending employee will be subject to disciplinary action including termination. Importantly, the code does not preclude any employee from bringing any unethical or illegal practices to the attention of government officials or law enforcement.

Second, the Charge points to provisions within the "Unacceptable Activities" section concerning the protection of BakeMark's interests and confidential information, presumably to show that BakeMark intended to prevent Ms. Pastis from exercise her rights under the Act. A holistic review of the entire section contradicts that insinuation. This section sets forth a non-exhaustive list of activity that might result in discipline, including for example:

- Violation of BakeMark rules and any other actions that are obviously detrimental to efforts to operate profitably;
- Violation of security or safety rules;
- Failure to report an accident or injury;
- Violation of any law while performing work for BakeMark;
- Insubordination or refusal to obey instructions pertaining to job duties;
- Failure to cooperate fully or provide truthful information in an investigation;
- Dishonesty, falsification, or misrepresentation or work records;
- Violation of confidentiality agreement by giving confidential or proprietary information to competitors, other organizations, or unauthorized employees, or providing private information about co-workers to other parties;
- Poor attendance or tardiness; and
- Deliberate neglect of job duties.

When viewed as a whole, this section is aimed not at preventing employees from engaging in activity protected under the Act, but at requiring compliance with company policies to ensure a safe and productive working environment, to protect company trade secrets and private and/or personal information about employees, and to avoid violations of the law.

Third, the Charge cites portions of two sections of BakeMark's Social Media Policy, again in a disingenuous attempt to suggest that the policy prevented Ms. Pastis from exercising her rights under the Act. This is not the case, as the policy seeks only "to assist [employees] in making responsible decisions about [the] use of social media." Specifically, the policy requires employees using social media:

- To avoid posting content which might harm the job performance of the posting employee or other employees, or harm BakeMark's customers, suppliers, or BakeMark's legitimate business interests;
- To be respectful to co-workers, customers, suppliers, or people who work on behalf of BakeMark;
- To avoid posting complaints or criticism related to BakeMark **only to the extent that those posts could be viewed as (1) malicious, obscene, threatening or intimidating, (2) disparaging toward customers, co-workers, or suppliers, or (3) harassing or bullying**;
- To be honest and accurate in all social media posts relating to BakeMark; and

Katherine T. King-Walker
March 1, 2023
Page 3

NORTON ROSE FULBRIGHT

- To maintain the confidentiality **of BakeMark's trade secrets, confidential information, or other sensitive internal business-related information**.

In short, this policy—either as written or as applied—does not restrict the ability of any employee to engage in concerted activity protected under the Act.

Lastly, despite Ms. Pastis' claim to the contrary, BakeMark was fully compliant with federal, state, and local laws and regulations requiring notification of COVID exposure in the workplace. In accordance with those laws and regulations, BakeMark notifies all employees who had been in contact (15 minutes or more within 6 feet) with an infected employee 2 days prior to the positive test.

## II.    Ms. Pastis' Employment with BakeMark

Ms. Pastis was hired on January 28, 2021 as a senior buyer in BakeMark's Tempe, Arizona branch. Her essential job duties include, among others:

- Managing inventory of products and commodities from assigned vendors;
- Ensuring that the products and commodities meet BakeMark quality specifications, and taking corrective action to address defective goods;
- Preparing and placing purchase orders;
- Tracking actual and market cost changes for products and commodities;
- Ensuring that the budget and financial targets are met;
- Effectively communicating with sales, accounting, and the warehouse to ensure proper inventory and cash flow; and
- Treating customers, vendors, and colleagues with respect, courtesy, and kindness.

## III.    Ms. Pastis' Alleged Complaints

### A.    Complaints About Compensation

BakeMark's policies are clear: no employee has any entitlement to pay increases or bonuses, and all such decisions are made at the sole discretion of the company. However, certain groups of employees, including Ms. Pastis, received a bonus for their work in 2021. This bonus was paid in early 2022. After receiving this bonus, Ms. Pastis felt this bonus was less than she deserved and raised it with her supervisor Leslie Walker and other members of management. In or about March 2022, Mr. Walker explained to her how the bonus was calculated. The bonus was based 25% on BakeMark meeting overall corporate financial objectives, and 75% on the Tempe branch meeting branch-specific financial objectives. Because the Tempe branch did not meet its branch-specific objectives for 2021, bonuses for all eligible employees in the Tempe branch (including Ms. Pastis) were based only on the 25% attributed to the overall corporate objectives. Ms. Pastis also complained about the raise she received for 2022 despite not being entitled to any pay increase under company policy.

Katherine T. King-Walker
March 1, 2023
Page 4

NORTON ROSE FULBRIGHT

### B.    Unfounded Complaints About BakeMark Product Safety

In or about May 2022, Ms. Pastis sent a "report" filled with unfounded allegations about both the operations of the Tempe branch and her co-workers. Ms. Pastis sent this report to Mr. Affarka and Rosemarie Gomez, BakeMark's Director of Human Resources. In accordance with BakeMark's Code of Business Ethics and Conduct, Mr. Affarka initiated an investigation into the allegations. Considering the seriousness of the allegations, BakeMark even engaged an independent third-party to investigate the food-safety claims. Both investigations ultimately showed that none of these allegations had any merit.

This 32-page "report" had two chief claims concerning supposed safety issues with BakeMark's products. First, she alleged that BakeMark was keeping goods in storage beyond their expiration dates and selling them to customers. This allegation has no basis in truth. These goods are used in BakeMark's products and recipes specifically because they enable both professional and amateur bakers to store and safely use the products at any time. Contrary to Ms. Pastis' allegations, **the goods are non-perishable and do not have expiration dates**. Instead, the goods have a "best-if-used-by" date. Under applicable food-safety laws and regulations, a best-if-used-by date does not constitute an expiration date. Using these goods after the best-if-used-by date has absolutely no bearing on the safety of the goods, but rather requires the baker to adjust the recipe to ensure that the end-product turns out correctly.

Second, she alleged that BakeMark was selling products that showed signs of bugs on the exterior of the packaging. To say that this allegation was a half-truth is an understatement. While some products do arrive with signs of bugs on the exterior of the packaging—an issue faced by all companies reliant on nationwide shipping networks—they are stored in offsite freezers designed to exterminate any bugs. Only after the company confirmed that the food products had no trace of any foreign material and were otherwise in complete compliance with food-safety law, the products were transferred back to the main warehouse for stocking and eventual sale.

As a senior buyer working for the company for over a year at that point, Ms. Pastis was aware of both of these facts before she prepared this "report." Indeed, one of the documents contained within the "report" was an email between Ms. Pastis and Naser Affarka, BakeMark's Manager of Internal Controls, in which the latter told Ms. Pastis that while he raised her concerns about the products with corporate, "there is nothing illegal" about the storage, sale, or use of the products.

Ms. Pastis also complained about errors with the Tempe branch's inventory and service level numbers. After Mr. Affarka investigated this claim, BakeMark put a specific management team in place to determine if there were any errors within the inventory and service processes, and, if found, to remedy those errors. Additionally, a new process was put in place to ensure the inventory and service processes were accurate and compliant with company policy.

The "report" contained, to BakeMark's consternation, salacious allegations about her co-workers, including selling and using drugs at the warehouse, drinking on the job, and having inappropriate relations in delivery trucks. BakeMark thoroughly investigated each of these claims, some before Ms. Pastis even raised them, and addressed them as required.

Katherine T. King-Walker
March 1, 2023
Page 5

NORTON ROSE FULBRIGHT

The results of both the internal and independent investigations were clearly explained to Ms. Pastis by Ms. Gomez and Mr. Affarka in a number of meetings and largely confirmed what Ms. Pastis already knew: that BakeMark's storage and sale of its products were completely compliant with company policy and food-safety law, and that the rumors concerning her co-workers were unfounded. As to the inventory errors, BakeMark put in place an updated policy and a specific team to address and resolve any issues moving forward.

Apparently, the results of the investigations, BakeMark's plan to remedy the inventory issues, and BakeMark's repeated efforts to assuage her concerns did not satisfy Ms. Pastis. She continued to raise the same unfounded allegations about the storage and sale of goods and products despite the investigations conclusively showing that these processes were compliant with company policy and food-safety law. BakeMark explained this to her time and time again, but she refused to accept these facts. She also claimed the solutions to address inventory issues—despite being compliant with company policy and the law—were insufficient, and was seemingly disappointed that she was not in control of implementing these solutions.

### C.    Complaints About COVID-19 Notifications

On December 19, 2022, Ms. Pastis sent the following email to Ms. Gomez:

> "I've been made aware that at least 3 people have tested positive for COVID in this building in the last month and nothing was ever said to anybody in the office so that we could protect ourselves. Please advise why the branch wasn't advised that we were at risk? I need an answer by the end of the day or I will escalate this to Jim Park, at the very least."

After investigating the matter, Ms. Gomez was able to determine that two employees had tested positive for COVID-19 on November 30, 2022 (Employee 1) and December 3, 2022 (Employee 2) respectively. After testing positive, both employees filled out a "Communicable Disease Questionnaire" which asked, among other things, the employee to identify any co-workers with whom they had been in close contact with during the 2 days prior to the positive test. Employee 1 identified two warehouse workers, and Employee 2 identified an employee working out of the Tempe branch office—neither identified Ms. Pastis. All three potentially exposed employees were promptly notified by the company.

Because Ms. Pastis was not in close contact with either of the infected employees, she was not required to be notified of their positive test. Employee 1 was only in close contact with warehouse employees, while Ms. Pastis worked out of the office. Although Employee 2 worked out of the Tempe office with Ms. Pastis, she had not had any contact at all with Ms. Pastis in the days prior to her positive test. During the week in question, Ms. Pastis was only in the office from Monday to Wednesday. Employee 2 tested positive on Saturday of that week, and so the two never overlapped in the office during the relevant time period. By the time Ms. Pastis returned to work the following Monday, both infected employees were quarantining and not permitted in the office until they received a negative test.

Katherine T. King-Walker
March 1, 2023
Page 6

NORTON ROSE FULBRIGHT

## IV.    Ms. Pastis' Poor Performance and Violations of Company Policy

For the first year of her employment, Ms. Pastis was an effective, hard-working member of the team. In 2022, however, Ms. Pastis' job performance declined and her relationships with supervisors and co-workers suffered. For instance, she required coaching from management regarding her miscoding inventory, failing to respond to requests from management about inventory items required for a customer, and routinely failing to work collaboratively with her co-workers and supervisors. More distressingly, she became hostile, unreliable, and seemingly unwilling to work with team members. For instance,

- Mr. Affarka, after meeting with her on December 20, 2022, described her as "extremely negative and the branch team that I've met all feel the same way."
- Liza Salcedo, BakeMark's Associate General Manager, complained that Ms. Pastis spoke to her in "her typically loud, aggressive, and disrespectful tone."
- Ms. Pastis told Ms. Salcedo that she had not seen a specific email from management due to internet connectivity issues despite responding to multiple emails throughout the day.
- BakeMark's General Manager, Tyler Nielsen, complained that Ms. Pastis regularly provided evasive and unhelpful responses to questions from team members, deflected responsibility, and only selectively did what she wanted to do—all to the detriment of the team's ability to service its customers.
- Mr. Nielsen also complained that Ms. Pastis belittled her team member, Nancy Dunning, when she made mistakes and generally created a "toxic environment."

These are but a few of the many examples of Ms. Pastis' continued failure to work well with her team members and supervisors. BakeMark attempted to resolve these issues through informal coaching without resorting to formal disciplinary procedures. Nevertheless, not only did Ms. Pastis' conduct not improve, but it worsened—necessitating formal written corrective disciplinary counseling on two occasions. Those written disciplinary counseling documents provided a detailed explanation of the facts pertaining to a number of continuing violations of company policy.

The first formal written disciplinary action, dated December 19, 2022, concerned Ms. Pastis' failure to adhere to BakeMark's new "code out" process. This process was implemented by in October 2022 and communicated to Ms. Pastis and all other similarly situated employees. By December 2022, however, Ms. Pastis still was not adhering to the new coding process. On December 2, 2022, the regional buyers sent additional communications to the senior buyers and their teams to review the updated code out process. Ms. Pastis was asked again to comply with the new process on December 14 and 15, 2022, but she refused. At that point, BakeMark was left with no choice but to formally discipline her.

This formal discipline was explained to Ms. Pastis during a meeting with Mr. Walker and Ms. Salcedo on December 19, 2022. Unfortunately, the meeting was not productive. When given the corrective action write up, Ms. Pastis said that she would not engage in the conversation, but instead would be calling her attorney and stood up to leave the room. Mr. Walker was ultimately able to convince Ms. Pastis to stay in the room so he could walk her through the document and chart a course correction. After doing so, he asked Ms. Pastis to sign the write up, but she refused and reiterated that she would be calling her attorney.

Katherine T. King-Walker
March 1, 2023
Page 7

NORTON ROSE FULBRIGHT

Two days later, Mr. Walker sent Ms. Pastis a follow up email summarizing the December 19 meeting. In her response, Ms. Pastis refused to take responsibility for her conduct, deflected blame to others, or ignored the complaints outright. For example:

| Conduct | Ms. Pastis' Response |
|---|---|
| Regularly using a harsh, negative tone when speaking with BakeMark's regional purchasing manager. | Deflected by pointing to the harsh and negative tone used toward her by her team member to justify her own use of that tone to the regional purchasing manager. |
| Hanging-up on co-workers when disagreements arose during discussions concerning business decisions. | Pointing to that same co-worker's tone to justify her hanging-up on co-workers when disagreements arose concerning business decisions. |
| Failing to provide an update on the completion of projects aimed to resolve vendor code errors. | Refusing to implement this new process because, according to Ms. Pastis, "it sounds very shady and reliant solely on human input" despite the process being compliant with company policy and the law. |
| Failing to be in the office during core business hours from Monday to Friday to the detriment of team collaboration and in violation of company policy. | Blithely asking "what are core business hours" despite being employed by BakeMark for nearly three years at that point. |

Following the initial disciplinary action, Ms. Pastis' conduct only worsened, necessitating a second formal written disciplinary action. The write up detailed the additional policy violations and performance issues, including:

| Date(s) | Performance Issues and/or Policy Violations |
|---|---|
| 1/23/2023 – 2/3/2023 | An employee reached out to the leadership team as they felt attacked during a back-and-forth email exchange with Ms. Pastis regarding cut off times for a national account customer. During that communication the employee attempted to reach out to Ms. Pastis via phone and Ms. Pastis failed to reply. As a result of this exchange Ms. Pastis failed to return important phone calls to a National Account Manager (an "internal customer") regarding the external customer. This failure violated the company policy of providing customer service to an internal customer, and negatively impacted the ability to service the external customer. |
| 2/8/2023 – 2/9/2023 | Falsely telling a group of employees during a fire drill that the Tempe branch never had a fire drill in the two years she had been employed by BakeMark and that she did not know where to go during a drill. When Ms. Dunning chimed in |

Katherine T. King-Walker
March 1, 2023
Page 8

NORTON ROSE FULBRIGHT

| | | |
|---|---|---|
| | | "so now you know," Ms. Pastis rudely snapped-back, "I wasn't talking to you," before storming off. The others involved in the conversation apologized to the offended employee on Ms. Pastis' behalf. |
| 2/13/2023 | | Ms. Pastis published a post on the social media platform LinkedIn accusing BakeMark's outside ownership of the same unfounded allegations she previously raised concerning the storage and sale of goods and supposed inventory errors. Given that these allegations were conclusively disproved by investigations, and Ms. Pastis was well aware of the results of these investigations, the content of her LinkedIn post was knowingly false and inaccurate, thereby violating BakeMark's Social Media Policy.<br><br>Ms. Pastis only removed this post after BakeMark's counsel requested of her counsel that she provide the factual basis for the assertions, which she could not. |
| 2/17/2023 | | When the acting general manager for Phoenix requested collaboration on a baking cup item for the New Mexico market, Ms. Pastis' communications with him were not collaborative or helpful, but rather evasive and not constructive. This conduct was in violation of her job duties as a senior buyer, specifically the requirement to discuss defective or unacceptable goods or services with management, sales, and quality control personnel to determine source of trouble and take corrective action. |

On February 27, 2023, Mr. Beasley had a discussion with Ms. Pastis to discuss this written disciplinary report. Mr. Neilsen and Ms. Salcedo were also present. Both the meeting and the written disciplinary report made clear that Ms. Pastis' conduct was unacceptable and violated BakeMark's core values. While the discipline was meant to encourage Ms. Pastis to correct her behavior, Mr. Beasley also made it clear that this was her final warning, and future violations of company policy may result in termination of her employment.

During the meeting, Ms. Pastis behaved completely unprofessionally while Mr. Beasley attempted to walk her through the details of the disciplinary report. She repeatedly interrupted him, spoke in a loud and aggressive manner, mockingly laughed and rolled her eyes, and deflected responsibility by claiming that other employees (including her own team member) allegedly did not adhere to BakeMark's code of conduct. At one point, she even pointed to the code of conduct and said "Bring it on; I will forward to my attorney." When asked about her LinkedIn post—the content of which she knew was false when she published it—she laughed and stated that she stood by the post because "she knew the GM was planning on forging documents." At the end of the meeting, Ms. Pastis refused to sign the document, asked Mr. Beasley if he was done, and left the room.

## V.    Ms. Pastis' Retaliation Allegations Are Not Supported by Fact

The Charge asserts that Ms. Pastis was retaliated against because she complained about (1) the amount of her 2021 bonus, (2) the lack of COVID related safety protocols including providing

Katherine T. King-Walker
March 1, 2023
Page 9

^
NORTON ROSE FULBRIGHT

notifications to employees about exposure, and (3) food safety and inventory errors. The Charge
further claims that the retaliation took the form of (1) her being separated or isolated from her co-
workers by requiring her to change offices, (2) prohibiting her from telecommuting twice per week,
and (3) written corrective discipline she received due to policy violations. This claim has no merit.

Under section 8(a)(1) of the Act, it is an unfair labor practice for an employer to "interfere with,
restrain, or coerce, employees in the exercise of rights guaranteed" under the Act. A finding of
retaliation in violation of section 8 of the Act requires substantial evidence supporting a finding
that an employee (1) engaged in "concerted activity," and (2) was subject to an adverse
employment action because of those activities. *See N.L.R.B. v. Portland Airport Limousine Co.,
Inc.*, 163 F.3d 662, 664 (1st Cir. 1998).

As to the first element, Ms. Pastis' conduct was not "concerted activity" sufficient to establish a
violation of the Act. The term "concerted activit[y]" in Section 7 of the NLRA "embraces the
activities of employees who have joined together in order to achieve common goals." *See NLRB
v. City Disposal Sys. Inc.*, 465 U.S. 822, 830–31 (1984). Section 7 requires both "concert" and
activity for "mutual aid or protection." *E.I. Du Pont De Nemours & Co. v. NLRB*, 707 F.2d 1076,
1077–78 (9th Cir. 1983). The NLRA does not protect an employee acting alone to complain about
an issue, even if the issue concerns mutual aid or protection. "[I]t is the backdrop of other group
activity that transforms it into concerted action." *Id.* at 1079; *see also Parker Labs., Inc.*, 267 NLRB
1174, 1177-1178 (1983) (Employees who raise purely individual concerns or gripes are not
engaged in concerted activity under the Act).

Here, Ms. Pastis' complaint about her 2021 bonus is a purely individual concern and thus not
concerted activity under the Act. *Parker Labs.*, 267 NLRB at 1177-1178. Further, although Ms.
Pastis complained about what she deemed to be a failure to notify employees of potential COVID-
19 exposure in the workplace, her complaints were unfounded—as all exposed employees were
promptly notified. Ms. Pastis, on the other hand, was not notified because she was not in close
contact with the individuals in question. In order to qualify as concerted activity under the Act, Ms.
Pastis needed to have a "reasonable good faith belief" that her working conditions were unsafe
or that BakeMark failed to follow proper protocol concerning exposure notification. Her complaint,
however, was based on a lack of knowledge (i.e., that because she was not made aware of the
exposure notifications, the notifications must not have been made at all). This is far from a
reasonable good faith belief, and therefore does not constitute concerted activity. Lastly, the
complaints about food safety and inventory errors were made by Ms. Pastis alone and were not
the result of a "logical outgrowth of prior concerted activity." *See NLRB v. Mike Yurosek & Son,
Inc.*, 53 F.3d 261, 265 (9th Cir. 1995) (individual acts may be concerted activity where subsequent
events reveal group endorsement). Because none of these complaints were made in concert with
other employees, whether explicit or implicit, Ms. Pastis' complaints cannot constitute concerted
activity under the Act.

As to the second element, there is no proof that Ms. Pastis was subject to adverse employment
actions because she engaged in concerted activity.

At the outset, two of the supposed adverse employment actions suffered by Ms. Pastis were not
adverse employment actions at all. First, Ms. Pastis was not forced to relocate to an isolated office
away from her co-workers. Ms. Pastis shared an office with her team member Ms. Dunning. As

Katherine T. King-Walker
March 1, 2023
Page 10

NORTON ROSE FULBRIGHT

detailed above, the two were frequently at-odds with each other, and Ms. Pastis regularly complained about having to share an office with her. In October 2022, the problem came to a head when Ms. Pastis complained to human resources that Ms. Dunning sarcastically told her "don't report me" while looking at a lunch menu on her computer. Ms. Pastis interpreted this as a hostile comment that was "obviously retaliatory for everything I've reported." Notwithstanding Ms. Pastis' overreaction, in an effort to reduce the tension between the two, Mr. Walker asked Ms. Pastis if she would like to move to a private office upstairs. Ms. Pastis was appreciative of the gesture and welcomed the move. A voluntary move of office space cannot constitute an adverse employment action.

Second, Ms. Pastis not being permitted to telecommute twice a week is not an adverse employment action. As COVID-related restrictions eased, BakeMark reinstituted a company-wide policy requiring all employees to work 5 days a week on location at the branch office. This policy was applied equally to all employees in the Tempe branch, not just Ms. Pastis. Ms. Pastis was reminded of this policy during her December 19, 2022 corrective action meeting with Mr. Walker and Ms. Salcedo. Put simply, a neutral company attendance policy that was applied to every employee in the branch cannot constitute an adverse employment action against Ms. Pastis.

Accordingly, the only conduct which could possibly constitute an adverse employment action was the formal discipline she received in late 2022 and early 2023. Nevertheless, BakeMark has provided substantial evidence that Ms. Pastis was disciplined for a legitimate business reason—continuously violating company policy—an thus no causal link exists between the alleged activity and the adverse employment action.

As an initial matter, there is no direct evidence showing that the discipline was motivated by retaliatory animus. Nor does the circumstantial evidence support Ms. Pastis' claim. Rather than demonstrating any intent to retaliate against Ms. Pastis because of her complaint, the facts demonstrate the opposite: that BakeMark bent over backwards to address these complaints and assuage Ms. Pastis' concerns. Based on her complaints alone, the company initiated two investigations—one internal and one external—and kept Ms. Pastis apprised of the status of those investigations throughout the process. BakeMark continued to meet with Ms. Pastis concerning these complaints for months following the conclusion of the investigation, including one-on-one meetings between Ms. Pastis and Mr. Affarka. Ms. Pastis herself recognized the company's efforts. For example, in July 2022, Mr. Affarka met with Ms. Pastis about her allegations and described the meeting as "positive." Ms. Pastis told Mr. Affarka that she "really appreciated the support and feedback," and the two agreed to keep communication open to discuss solutions to the inventory issue and any further issues that may arise. This is a far cry from evidence of intent to retaliate against an employee who raised seemingly serious issues concerning the company's policies and practices—regardless of the fact that the complaints were unfounded.

Finally, any attempt to point to the temporal proximity of her protected activity and her formal discipline as circumstantial evidence of retaliation is similarly meritless. According to the United States Supreme Court, temporal proximity between the employer's knowledge of protected activity and an adverse employment action can only constitute sufficient evidence of causality if the temporal proximity is "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). Federal courts within Arizona have held that a five-month lapse of time between the activity and the adverse employment action is too long to constitute sufficient evidence of

Katherine T. King-Walker
March 1, 2023
Page 11

NORTON ROSE FULBRIGHT

causation to establish a retaliation claim. *Hargrow v. Federal Exp. Corp.*, 2006 WL269958, at *6 (D. Ariz. Feb. 2, 2006); *see also Sauzek v. Exxon Coal USA*, 202 F.3d 913, 918–19 (7th Cir. 2000) (three-month interval insufficient for causation).

Here, Ms. Pastis' only complaint which might arguably constitute concerted action (concerning food safety and inventory issues) were made by May 2022 at the latest, but Ms. Pastis was not formally disciplined by the company until December 2022 (seven months after the fact) and February 2023 (nine months after the fact)—well beyond the five-month lapse of time found to be too long to constitute evidence of causation in *Hargrow*, 2006 WL269958, at *6. Because Ms. Pastis cannot establish a causal link between any concerted activity and her formal discipline through either direct or circumstantial evidence, Ms. Pastis cannot establish a claim for retaliation in violation of the Act.

As Ms. Pastis cannot prove that she either engaged in concerted activity or was retaliated against because of it, her claim for violation of section 8 of the Act fails and must be dismissed.

## VI.    The Charge Should be Dismissed

For the foregoing reasons, Ms. Pastis cannot establish any retaliation in violation of the Act, and accordingly, the Charge should be dismissed in its entirety.

Very truly yours,

Phillip Di Tullio

PRD
Enclosures

134927714.1

# EXHIBIT 2

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-B6E5-21941D43657C

## EMPLOYEE ACKNOWLEDGEMENT

You have been given this Employment Handbook to ensure that you are aware of BakeMark policies and practices (table of contents on reverse side). Please read this booklet carefully so that you understand all the sections. This Handbook replaces any previous understanding, practice, manual, handbook, policy or representation concerning the subject matters covered by the Handbook.

BakeMark reserves the right at its sole discretion and at any time, with or without any notice, to rescind or to modify all or part of the policies and procedures, or their application to any individual.

This Handbook is not a contract of employment. BakeMark reserves the right to alter any of these policies, at its discretion, and reserves the sole discretion to determine how, and when, these guidelines or policies will be followed. Nothing in the Handbook in any manner alters the "at will" status of each Employee, and BakeMark and the Employee are free to terminate the employment relationship at any time, with or without cause and with or without notice. No Manager or other representative, other than the President, of BakeMark has the authority to enter into an employment agreement for any specified period of time or to make any agreement contrary to the foregoing. Any enforceable agreement for employment for a specified period of time must be in writing, must refer to the Employee by name, must contain the specified period of employment, and must be dated and signed by BakeMark President.

We ask that you sign the bottom portion of this sheet verifying that you have received and understand this Handbook. Your signature also binds you to the confidentiality obligations explained herein that continue should your employment with BakeMark end for any reason. After you sign this sheet, please return it to the Human Resources Department. This form will then become part of your permanent personnel file.

Name (print)___Carolyn Pastis_____

Signature___*Carolyn Pastis*_____
— DocuSigned by:
443BCC41E3F442F...

Employee ID Number_____ Date___1/25/2021____

**BakeMark USA Handbook • Revised April 2, 2018**



# DFEH Acknowledgement

I have received a copy of the Department of Fair Employment & Housing brochure DFEH-185-ENG / April 2017, and understand that harassment in the workplace is forbidden by law and violates the provisions of the Fair Employment and Housing Act.

I also understand that BakeMark prohibits any type of harassment.

Carolyn Pastis
**Printed Name**

Carolyn Pastis
**Signature**

1/28/2021
**Date**

Sexual Harassment Acknowledgement 10 11 2017.doc



# Initial FMLA Rights Notification Acknowledgement

I have received a copy of the General Notice of Employee Rights under the Family and Medical Leave Act (Form WH1420 Rev 04/16) and understand my rights regarding this notice.

Carolyn Pastis
**Printed Name**

Carolyn Pastis
**Signature**

1/28/2021
**Date**

Initial FMLA Rights Notification Acknowledgement.doc 10.11.2017



# Job Description Acknowledgement

I have received a copy of my Job Description and understand my accountabilities and responsibilities as they relate to my position with BakeMark, subject to change with or without notice.

_Carolyn Pastis_
**Printed Name**

_Carolyn Pastis_
**Signature**

_1/28/2021_
**Date**



# General Cobra Notice Acknowledgement

I have received a copy of the Continuation Coverage Rights under Cobra Notice.

Carolyn Pastis
**Printed Name**

Carolyn Pastis
**Signature**

1/28/2021
**Date**

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-E    21941D43657C



## EMPLOYEE NON-COMPETITION, NON-SOLICITATION, INVENTIONS & CONFIDENTIALITY AGREEMENT

This Employee Non-Competition, Inventions & Confidentiality Agreement (this "Agreement") is entered into between BakeMark USA LLC (the "Company") and _____Carolyn Pastis_____ ("Employee").

**WHEREAS**, Employee is employed by, or is about to be employed by the Company;

**WHEREAS**, the Company and Employee agree that through Employee's employment with the Company, Employee will receive (or has received) significant training and will gain (or has gained) significant knowledge and expertise in specific areas related to the Company's business of manufacturing and marketing ready-to-use icings, fillings, mixes and bases, frozen dough and batters, donut glazes, icing bases, icing and glaze stabilizers, cake frosting and related products ("Baking Products"), which training, knowledge and expertise Employee would not have otherwise obtained;

**WHEREAS**, Employee and the Company further agree that through Employee's employment with the Company, Employee will be placed in a position of trust and confidence with the Company and that the Company will provide (or has provided) Employee with confidential and proprietary information concerning its business, products, suppliers, manufacturers, pricing, customers, and employees, and will entrust Employee with business relationships and good will of great value to the Company;

**WHEREAS**, the Company and Employee also agree that through Employee's employment with the Company, Employee may conceive or produce (or has conceived or produced) inventions relating to the Company's business and may learn or develop Confidential Information, as defined below, the disclosure of which to any third party would cause irreparable harm to the Company;

**WHEREAS**, the Company and Employee also agree that through Employee's employment with the Company, Employee may use confidential customer information provided by the Company or developed by Employee; and

**WHEREAS**, in light of the foregoing, Employee and the Company agree that the following restrictions are necessary and reasonable for the protection of the Company's legitimate business interests, including its investment in Employee's training, its good will, its confidential information and customer relationships, and the continued success of its business.

**NOW, THEREFORE**, in consideration of Employee's employment or continued employment with the Company, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee and the Company agree as follows.

1.    No Restrictions on Employee

Employee warrants and represents that Employee is not subject to any non-competition/non-solicitation restriction or other restrictive covenant that would restrict Employee's ability to enter into this Agreement or perform the duties required by the Company in conjunction with Employee's employment. Employee will not disclose to the Company, or use on its behalf, any confidential or proprietary information of a former employer or other third party if an obligation exists to protect the confidentiality of such information.

2.    Notification to Third Parties

Employee acknowledges and agrees that the Company may notify any future or prospective employer of Employee, any client of the Company, or any other appropriate third party of the existence and the terms of this Agreement.

3.    Independent Enforceability

Each of the rights and remedies set forth in this Agreement will be independent of the others, and will be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or equity or applicable to Employee under any other the Company policy or guideline.

4.    Disclosure of Confidential Information

Employee shall hold Confidential Information (as defined below) in the strictest confidence and shall not, without the prior written authorization of an authorized the Company officer, or as required by law, disclose Confidential Information in any manner to any person, or use Confidential Information in any way, other than in the furtherance of Employee's duties during his/her employment with the Company. The foregoing obligation shall apply at all times during employment with the Company and for a period of five (5) years thereafter, unless such information qualifies as a trade secret, in which case the foregoing obligation shall continue for so long as the

trade secret remains protected under applicable law. Employee will not copy, duplicate or reproduce Confidential Information for any purpose other than for use by or on behalf of the Company and will not improperly take or retain such information without the Company's prior written consent. Employee will comply with all Company policies, procedures and practices pertaining to such Confidential Information and take all commercially reasonable steps to protect and maintain the secrecy thereof.

     (a)    "Confidential Information," as used herein, means trade secrets (as defined by applicable law) or other confidential and proprietary information relating to the Company's customers, manufacturing, products, services, pricing and sales, research, business, practices, procedures or Baking Products not generally known by or available to the public that Employee becomes privy to by virtue of employment with the Company, including but not limited to the following:

        (i)    collected or compiled information about the Company's customers, including names, addresses, telephone numbers, contact persons and other identifying information with respect to the needs and requirements for customers; information dealing with the nature of customers' accounts, including the dates on which agreements between the Company and such customers will end and/or be subject to renewal; and rate and price information and history relating to products provided by the Company to its customers;

        (ii)    information about the Company's internal methods of operation and manufacturing, including information relating to the machinery, equipment, processes, product mix and formulas by which the Company develops and manufactures its Baking Products; and

        (iii)    information about the Company's sales, finances and business, including business and marketing plans, practices and strategies; information with respect to the Company's suppliers and the availability of materials and supplies used in its business; and non-published financial information relating to the Company's income, budgeting, cost structures, expenses, profits and general financial standing.

     Confidential Information does not include any information that is or shall become generally known in the trade through no fault of Employee; any information Employee receives in good faith from a third party who has the right to disclose such information and who has not received such information, either directly or indirectly, from the Company; or any information that was within Employee's legitimate possession prior to his/her employment by the Company.

     Confidential Information disclosed by the Company or any of its affiliates to Employee will remain the exclusive property of the Company or its affiliates, and all rights to Confidential Information will be held in trust by Employee for the benefit of the Company. Neither this Agreement nor the disclosure or revelation of Confidential Information will constitute or be construed as granting to Employee, by implication or otherwise, any right, title or license under any patent, patent application, trademark, copyright or any know-how to which the Company or any of its affiliates now has or hereafter may obtain, or as imposing on Employee any obligation, except as specified in this Agreement. The Company does not make any representations or warranties regarding the infringement of any patents, trademarks or copyrights held by any third party.

     Notwithstanding anything herein to the contrary, Employee may not be held criminally or civilly liable under any federal or state trade secrets law for any disclosure of a trade secret that is (i) made in confidence to a federal, state or local governmental, regulatory or administrative agency, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (ii) set forth in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and provided Employee does not otherwise disclose such information except pursuant to court order. Nothing herein is intended, or should be construed, to affect the immunities created by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., or other applicable law.

5.    <u>Return of Materials</u>

     Upon termination of Employee's employment with the Company, whether with or without cause, and whether initiated by Employee or the Company ("Termination"), or at any other time at the Company's request, Employee shall deliver to the Company all of its materials, documents, plans, records, notes, drawings, or papers and any copies thereof (whether electronic or hard copy) which may be in Employee's possession or under Employee's control pertaining to the Company's business, including in particular all notes or records Employee has relating to the Company customers, prospective customers or Confidential Information. Immediately upon Termination, Employee will not access, download, delete, erase or transmit any information stored on any Company server, network, web-based data storage account or service, computer, e-mail account, intranet, telephone/voicemail system, smartphone or electronic storage device without the Company's prior written consent, and will refrain from accessing any Confidential Information stored on any personal computer, e-mail account, tablet, smartphone, electronic storage device or web-based data storage account or service. Employee will inform the Company of all such media and, upon direction from the Company, will permanently delete and erase any Confidential Information stored on such media and/or allow the Company or its designee to access and forensically examine such media to ensure that all such information has been permanently deleted and erased. Upon request from the Company, Employee shall certify in writing that he or she has fully complied with the obligations set forth in this Section 5.

6.    <u>Non-Competition</u>

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-E    21941D43657C

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require Employee to engage in Competitive Activities or provide Competitive Products or Services.

(a)    "Competing Business" means any individual (including Employee), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise which is competitive with the business conducted by the Company, including the manufacturing, marketing and sale of Baking Products.

(b)    "Competitive Activities" means duties or responsibilities that are the same as or functionally similar to those business activities or services Employee performed or supervised on behalf of the Company within two (2) years prior to Termination.

(c)    "Competitive Products or Services" means products or services that are competitive with Baking Products and related services offered or provided by the Company within two (2) years prior to Termination.

(d)    "Territory" includes any and all geographic areas where the Employee was undertaking his/her duties and/or responsibilities for Company within two (2) years prior to the time of his or her Termination from Company. If Employee has no such assigned or discernable territory during the relevant period, "Territory" means anywhere in the United States, which is the geographic area within which the Company conducts business. Employee may not circumvent the Territory through remote, electronic or other means.

7.    Customer Non-Solicitation/No-Service/Non-Interference

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, call upon or contact any Restricted Customers (as defined below) for the purpose of providing Competitive Products or Services; (b) contract with, sell to or perform services for or on behalf of any Restricted Customers in connection with Competitive Products or Services; or (c) divert, unlawfully interfere with, or attempt to divert or unlawfully interfere with, the Company's business relationship with any Restricted Customers. The term "Restricted Customers" means existing customers with whom the Company has conducted business within two (2) years prior to Termination and with whom during such time Employee had business-related contact or was privy to Confidential Information.

8.    Employee Non-Solicitation/No-Hire

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, induce or encourage any Restricted Employees (as defined below) to terminate their employment or other association with the Company or to work for a Competing Business; or (b) hire, caused to be hired or attempt to hire any Restricted Employees on behalf of a Competing Business. The term "Restricted Employees" means each and every person employed or otherwise engaged by the Company, including independent contractors, within two (2) years prior to Termination and with whom during such time Employee had supervisory responsibility, work-related contact or was privy to personnel information relating to such persons' compensation, benefits, job duties or performance evaluations. Notwithstanding the foregoing, "Restricted Employees" does not include persons who have not been employed or otherwise engaged by the Company for more than six (6) months at the time of any such solicitation, inducement, encouragement, hiring or attempted hiring.

9.    Tolling of Restrictive Periods

If Employee breaches any of the restrictions set forth in Sections 6, 7 or 8 and the Company commences a legal proceeding in connection therewith, the time period applicable to each such restriction shall be tolled and extended for a period of time equal to the period of time during which Employee is determined by a court of competent jurisdiction to be in non-compliance or breach (not to exceed twelve (12) months) commencing on the date of such determination.

10.    Inventions

(a)    Ownership of Inventions.  Employee agrees that all Inventions (as defined below) will be the sole and exclusive property of the Company. Employee will, with respect to any Invention, (i) keep current, accurate, and complete records, which will belong to the Company and be kept and stored on the Company's premises; (ii) promptly and fully disclose the existence and describe the nature of the Invention to the Company  in writing (and without request); (iii) assign (and Employee hereby assigns) to the Company all of Employee's right, title and interest in and to the Invention, any applications Employee makes for patents or copyrights in any country, and any patents or copyrights granted to Employee in any country; and (iv) acknowledge and deliver promptly to the Company any written instruments, and perform any other acts necessary in the Company's opinion to preserve property rights in the Invention against forfeiture, abandonment or loss and to obtain and maintain letters patent and/or copyrights on the Invention and to vest the entire right and title to the Invention in the Company. Employee agrees to perform promptly (without charge to the Company but at the expense of the Company) all acts as may be necessary in the Company's opinion to preserve all patents and/or copyrights granted upon the Inventions.

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-E    21941D43657C

(b)    Notice. Employee is hereby notified that, in accordance with Illinois Revised Statute, Chapter 165, §§ 1060/1–2, this Agreement does not apply to any Inventions for which no equipment, supplies, facility, or trade secret information of the Company is used and which is developed entirely on Employee's own time, and (1) which does not relate (A) directly to the business of the Company or (B) to the Company's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by employee for the Company.

(c)    Separate Assignment Agreement. The terms of the foregoing assignment as to any Invention may be subject to a separate assignment agreement between Employee and the Company. The existence of such an assignment agreement shall have no effect on the assignment pursuant to this Agreement of any other Invention.

(d)    Works Made for Hire. To the extent that any Invention qualifies as "work made for hire" as defined in 17 U.S.C. § 101 (1976), as amended, such Invention will constitute "work made for hire" and, as such, will be the exclusive property of the Company.

(e)    Presumption. In the event of any dispute, arbitration or litigation concerning whether an invention, discovery, improvement or idea made or conceived by Employee is the property of the Company, such invention, discovery, improvement or idea will be presumed the property of the Company and Employee will bear the burden of establishing otherwise.

(f)    "Inventions," as used herein, means any inventions, discoveries, improvements and ideas, whether or not in writing or reduced to practice and whether or not patentable or copyrightable, made, authored or conceived by Employee in connection with his/her employment with the Company, whether by Employee's individual efforts or in connection with the efforts of others.

11.    Reasonableness of Restrictions

Employee stipulates that the restrictions and obligations in this Agreement are reasonable (including the time periods, geographic area and activity limitations) and necessary for the protection of the Company's legitimate business interests, do not prohibit Employee from using general skills and know-how acquired during or prior to employment with the Company, and do not preclude Employee from earning a livelihood, working in his or her chosen field or otherwise impose any undue hardship. Employee further stipulates that the geographic area is necessary given the scope of the Company's business operations and because work for a Competing Business could support competition regardless of where Employee maintains an office or renders such work.

12.    Right to Injunction

The parties recognize that the Company will suffer irreparable damage if Employee violates or threatens to violate the terms of Sections 4, 5, 6, 7, 8 and 10, and that such damage would be difficult to quantify, and it is therefore agreed that, in the event of a breach or threatened breach of said Sections, the Company shall be entitled to injunctive relief, in addition to all other legal and equitable remedies available to it, without the necessity of posting a bond or other security. The prevailing party in any such action shall be entitled to recover its reasonable costs and attorneys' fees.

13.    Protected Activities

Nothing in this Agreement prohibits Employee (with or without notice to the Company) from reporting allegations to, responding to compulsory legal process issued from, testifying before or otherwise participating in an investigation or proceeding conducted by a federal, state or local government body, administrative agency or judicial authority concerning an unlawful employment practice, illegal conduct or a suspected violation of law, including, but not limited to, acts and omissions prohibited by Title VII of the Civil Rights Act of 1964, the Securities Exchange Act of 1934 or other comparable state and federal laws. Nor does anything in this Agreement prohibit Employee from making truthful statements and disclosures regarding alleged unlawful discrimination, harassment and/or retaliation or from discussing the terms, wages and working conditions of employment with the Company.

14.    Entire Agreement

This Agreement constitutes the entire agreement between Employee and the Company regarding the subject matter hereof, and replaces and supersedes all prior or contemporaneous communications, agreements or representations governing the same subject matter; provided, however, that this Agreement shall supplement to the extent possible any related Company policy or guideline contained in the Company's Employee Handbook or Policy Manual. In the event of any conflict between this Agreement and any Company policy, this Agreement shall control and govern.

15.    Interpretation; Severability of Invalid Provisions

All rights and restrictions contained in this Agreement may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws, and are intended to be limited to the extent necessary so that they will not render this Agreement illegal, invalid or unenforceable. If any term of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect. If a court of competent jurisdiction holds any provision

to be overbroad or unreasonable as written, the parties agree that the court shall reasonably alter such provision to the extent necessary to make the provision enforceable under applicable law, and enforce the provision as amended.

16.    Survival

    The restrictions and obligations in Sections 2, 4, 5, 6, 7, 8 and 10 shall survive the termination of this Agreement and the termination of Employee's employment with the Company.

17.    Agreement Binding

    This Agreement shall inure to the benefit of the Company and its successor, assignees, and designees and shall be binding upon Employee and his/her heirs, executors, administrators and personal representatives.

18.    Choice of Law

    This Agreement shall be governed by and construed in accordance with the substantive laws of the state of Georgia.

19.    Waiver

    No provision of this Agreement may be waived except in a writing duly signed by the party waiving such provision. Either party's action in not enforcing a breach of this Agreement shall not prevent such party from enforcing this Agreement as to such breach or any other breach.

20.    Modification

    Except as provided in Section 15, any additions, changes or modifications to this Agreement must be in writing, signed by Employee and the president of the Company. The President of the Company is the only the Company official with authority to make any additions, changes or modifications to this Agreement, enter into any contrary agreement, or to provide the Company's express written consent as described in Paragraph 4 of this Agreement.

21.    Counterparts

    This Agreement may be executed in any number of original counterparts or by facsimile or e-mail, each of which when executed and delivered will be deemed to be an original and all of which taken together will constitute but one and the same instrument. One or more counterparts of this Agreement may be delivered by facsimile or other electronic means, with the intention that delivery by such means shall have the same effect as delivery of an original counterpart hereof.

Employee
*Carolyn Pastis*
443BCC41E3F442F...
Signature                                                              1/25/2021
                                                                       Date

Carolyn Pastis
Printed Name

BakeMark USA, LLC
*Rosemarie Gomez*
A039DB867A6C43D...
Signature                                                              Director of Human Resources
                                                                       Title
Rosemarie Gomez                                                        1/25/2021
                                                                       Date
Printed Name

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-E    21941D43657C

| BAKEMARK | |
|---|---|
| **Arbitration Agreement** | Issue Date: 10/24/2017 |
| CDQM-6.3.3 | Rev: 01 |

### ARBITRATION AGREEMENT

As a condition of the employment or continued employment of Carolyn Pastis _____ ("Employee") by BakeMark USA, LLC ("the Company"), the Company and Employee enter into this Arbitration Agreement ("Agreement"). The term "Company" means and includes for all purposes of this Agreement, BakeMark USA, LLC and its affiliates and related organizations and their executives, employees, members, shareholders, and agents.

1.  **Agreement to Arbitrate Certain Disputes and Claims**

    a.  **Claims Subject To Arbitration**

Company and Employee agree to arbitrate before a neutral arbitrator any and all disputes or claims brought after the execution date of this Agreement, which would otherwise be subject to resolution in court, arising from or relating to Employee's recruitment to or employment with the Company, or the termination of that employment, including claims against any current or former agent or employee of the Company, whether the disputes or claims arise in tort, contract, or pursuant to a statute, regulation, or ordinance now in existence or which may in the future be enacted or recognized, including, but not limited to, the following claims:

(1)   Claims for fraud, promissory estoppel, fraudulent inducement of contract or breach of contract or contractual obligation, whether such alleged contract or obligation be oral, written, or express or implied by fact or law;

(2)   Claims for wrongful termination of employment, violation of public policy and constructive discharge, infliction of emotional distress, misrepresentation, interference with contract or prospective economic advantage, defamation, unfair business practices, and any other tort or tort-like causes of action relating to or arising from the employment relationship or the formation or termination thereof;

(3)   Claims for discrimination, harassment, or retaliation under any and all federal, state, or municipal statutes, regulations, or ordinances that prohibit discrimination, harassment, or retaliation in employment, to the fullest extent permitted by law, including but not limited to, claims arising under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967, and analogous state laws.

(4)   Claims for non-payment or incorrect payment of wages, commissions, bonuses, severance, employee fringe benefits, stock options and the like, whether such claims be pursuant to alleged express or implied contract or obligation, equity, state wage and hour laws, the Fair Labor Standards Act, the Employee Retirement Income Securities Act, and any other federal, state, or municipal laws concerning wages, compensation or employee benefits;

Employee Initials:_____

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-E    21941D43657C

| **BAKEMARK** | |
|---|---|
| **Arbitration Agreement** | Issue Date: 10/24/2017 |
| CDQM-6.3.3 | Rev: 01 |

(5)　　Claims arising out of or relating to the grant, exercise, vesting and/or issuance of equity in the Company or options to purchase equity in the Company;

(6)　　Claims for misappropriation of a trade secret, patent right, copyright, trademark, or any other intellectual or confidential property; and

(7)　　All other claims by and between Company and Employee.

Notwithstanding the foregoing, nothing in this Agreement prohibits either party from seeking provisional remedies in court in aid of arbitration including temporary restraining orders, preliminary injunctions, and other provisional remedies.

2.　　**Claims Excluded From Arbitration**

Company and Employee agree that the following claims are not covered by this Agreement and shall therefore be resolved in any appropriate forum, including courts of law, as required by the laws then in effect: (i) claims for workers' compensation benefits, unemployment insurance, or state or federal disability insurance; (ii) claims or disputes expressly excluded by arbitration as a matter of law; and (iii) claims expressly required to be arbitrated under a different procedure in accordance with the terms of an employee benefit plan are not covered by this Agreement and shall therefore be resolved in another appropriate form.

Nothing in this Agreement should be interpreted as restricting or prohibiting the Employee from filing a charge or complaint with a federal, state, or local administrative agency charged with investigating and/or prosecuting complaints under any applicable federal, state or municipal law or regulation. Any dispute or claim that is not resolved through the federal, state, or local agency must be submitted to arbitration in accordance with this Agreement. Either party to this Agreement may, if necessary, seek judicial relief in order to enforce this Agreement and/or seek dismissal for the failure to honor this Agreement.

3.　　**Waiver Of Jury Trial**

**COMPANY AND EMPLOYEE AGREE THAT THE ARBITRATION OF DISPUTES AND CLAIMS UNDER THIS AGREEMENT SHALL BE INSTEAD OF A TRIAL BEFORE A COURT OR JURY. COMPANY AND EMPLOYEE FURTHER UNDERSTAND THAT COMPANY AND EMPLOYEE ARE EXPRESSLY WAIVING ANY AND ALL RIGHTS TO A TRIAL BEFORE A COURT OR JURY REGARDING ANY AND ALL DISPUTES AND CLAIMS THAT THEY NOW HAVE OR MAY IN THE FUTURE HAVE THAT ARE SUBJECT TO ARBITRATION UNDER THIS AGREEMENT.**



Employee Initials:_____

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-L    21941D43657C

| **BAKEMARK** | |
|---|---|
| **Arbitration Agreement** | Issue Date: 10/24/2017 |
| CDQM-6.3.3 | Rev: 01 |

**4.    Arbitration Procedures**

    **a.    Demand For Arbitration**

To initiate a claim in arbitration, the Employee or the Company must make a written "Demand For Arbitration" and deliver it (i) by hand or first class mail to the other party and (ii) by hand, first class mail, or electronically to the American Arbitration Association ("AAA") within the applicable statute of limitations period.  The Demand For Arbitration shall, unless otherwise required by law, clearly state "Demand For Arbitration" at the beginning of the first page and include the following information:

    (1)    A factual description of the dispute in sufficient detail to advise the responding party of the nature of the dispute;

    (2)    The date when the dispute first arose;

    (3)    The names, work locations and telephone numbers of any co-workers or supervisors with knowledge of the dispute; and

    (4)    The relief requested by the requesting party.

A Demand for Arbitration from Employee must be submitted to the Company and delivered to the Human Resources Director, 7351 Crider Avenue, Pico Rivera, CA 90660.  A Demand for Arbitration from the Company must be mailed to Employee's last known address or hand-delivered to Employee.

    **b.    Timing Of Demand For Arbitration**

A Demand for Arbitration by either Company or Employee shall be filed and served on the opposing party within the statute of limitation that is applicable to the claim or claims on which arbitration is sought or required.  Any failure to demand arbitration within this time frame and according to this Agreement shall constitute a waiver of all rights to raise any claims in any forum arising out of any dispute that was subject to arbitration to the same extent such claims would be barred if the matter proceeded in court along with the same defenses to such claims.

    **c.    Place of Arbitration**

Company and Employee agree that the arbitration shall take place in Los Angeles County, California, or, at the Employee's option, the county in which the Employee resided at the time the arbitrable dispute or claim arose.



Employee Initials:_____

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-L    21941D43657C

| BAKEMARK | | |
|---|---|---|
| **Arbitration Agreement** | | Issue Date: 10/24/2017 |
| CDQM-6.3.3 | | Rev: 01 |

### d.    Rules Governing Arbitration

The arbitration will be administered by AAA and will be conducted in accordance with the Employment Arbitration Rules and Mediation Procedures of the AAA ("AAA Rules") in effect at the time the written demand for arbitration is made. A copy of the current AAA Rules may be obtained at the website of the American Arbitration Association [adr.org] or the Company's Human Resources Department. To the extent that any of the AAA Rules or anything in this Agreement conflicts with any arbitration procedures required by applicable law, the arbitration procedures required by applicable law shall govern. Company and Employee also agree that nothing in this Agreement relieves either of them from any obligation they may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Agreement.

### e.    Selection Of Arbitrator

All disputes shall be resolved by a single arbitrator selected in accordance with the AAA Rules.

### f.    Discovery

The arbitrator shall allow the discovery authorized by the Federal Rules of Civil Procedure or any other discovery required by applicable law in arbitration proceedings.

### g.    Motions Allowed

The arbitrator shall allow the parties to file dispositive motions, including but not limited to motions for summary judgment, partial summary judgment, and summary adjudication of the issues.

### h.    Award and Review

The arbitrator shall issue a written award that sets forth the essential findings and conclusions on which the award is based. The arbitrator will follow the substantive law applicable to the case and may award only those remedies that would have been available had the matter been heard in court including, without limitation, punitive damages and attorneys' fees. Judgment may be entered on the arbitrator's decision and enforced in any court having jurisdiction.

The arbitrator's award shall be subject to review, correction, confirmation, or vacation, as provided by any applicable law setting forth the standard of judicial review of arbitration awards.

### i.    Governing Law

This Agreement and its validity, construction and performance, as well as disputes and/or claims arising under this Agreement shall be governed by the Federal Arbitration Act or the laws of the State where the employee primarily works or worked, whichever more comprehensively provides for the enforcement of this Agreement.

### j.    Costs of Arbitration

Employee Initials: _____

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-E        21941D43657C

| BAKEMARK | |
|---|---|
| **Arbitration Agreement** | Issue Date: 10/24/2017 |
| CDQM-6.3.3 | Rev: 01 |

The Company shall bear the arbitrator's fee and any other type of expense or cost that the Employee would not be required to bear if he or she were free to bring the dispute or claim in court as well as any other expense or cost that is unique to arbitration. For claims an Employee initiates, the Employee will be responsible to pay the claim initiation fee charged under the AAA Rules, however, if the initiation fee exceeds what a court in the jurisdiction would have charged the Employee for filing a lawsuit based on the Employee's claims, then the Employee will only be responsible for the amount that the court would have charged and the Company will pay the remaining amount to AAA. The Company and Employee shall each pay their own attorneys' fees incurred in connection with the arbitration, and the arbitrator shall not have authority to award attorneys' fees unless a statute or contract at issue in the dispute authorizes the award of attorneys' fees to the prevailing party, in which case the arbitrator shall have the authority to make an award of attorneys' fees as required or permitted by applicable law. If there is a dispute as to whether the Company or Employee is the prevailing party in the arbitration, the Arbitrator will decide this issue.

5. **Class or Collective Claims Prohibited**

All disputes subject to arbitration under this Agreement will be litigated individually and the parties may not seek class of "collective" treatment for any claim, to the extent permitted by applicable law. The arbitrator does not have the authority to consolidate claims of one or more persons into one proceeding.

6. **Severability**

If any term or portion of this Agreement shall, for any reason, be held to be invalid or unenforceable or to be contrary to public policy or any law, then the remainder of this Agreement shall not be affected by such invalidity or unenforceability but shall remain in full force and effect, as if the invalid or unenforceable term or portion thereof had not existed within this Agreement.

7. **Complete Agreement**

This Agreement contains the complete agreement between the Company and Employee regarding the subjects covered in it; that it supersedes any and all prior representations and agreements between us, if any; and that it may be modified only in writing, expressly referencing this Agreement, and signed by the Company's Human Resources Manager and Employee. If any such modification is not or has not been signed by the Employee, but the Employee continues to accept employment after having notice of the modification, it shall become effective after a reasonable period.

Employee Initials: _____

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-E    21941D43657C

| | | |
|---|---|---|
| **BAKEMARK** | | |
| **Arbitration Agreement** | | Issue Date:<br>10/24/2017 |
| CDQM-6.3.3 | | Rev: 01 |

8.    **Knowing and Voluntary Arbitration Agreement**

Employee understands and agrees that he or she has been advised to consult with an attorney of his or her own choosing before signing this Agreement, and has had an opportunity to do so. Employee agrees that he or she has read this Agreement carefully and understands that by signing it, he or she is waiving all rights to a trial or hearing before a court or jury of any and all disputes and claims subject to arbitration under this Agreement.

9.    **No Alteration of At-Will Employment**

Employee understands and agrees that his or her employment with Company is and shall be at all times on an at-will basis, and Company or Employee may terminate Employee's employment at any time, for any reason, with or without cause or advance notice.  Nothing in this Agreement creates or is intended to create an express or implied contract for employment or continuing employment, nor does this Agreement otherwise modify, negate, or affect the at-will nature of Employee's employment with Company.

Date: _1/25/2021_____

*Carolyn Pastis*
—443BCC41E3E442F...
Employee Signature
Carolyn Pastis

_____
Employee Name (Please Print)

Date: _1/25/2021_____

COMPANY
*Rosemarie Gomez*
—A039DB867A6C43D...
By: _____

Its: _Director of Human Resources_____

Employee Initials: _____

DocuSign Envelope ID: 2DC81312-1BAF-4BD0-L     21941D43657C



## RELEASE AND DISCLAIMER FROM DRUG TESTING

I, _____Carolyn Pastis_____, hereby voluntarily agree to submit to any lawful drug test requested by, and conducted on behalf of BakeMark which BakeMark deems, in its sole discretion, to be reasonable necessary to provide its workers with a safe working environment.

I, _____Carolyn Pastis_____, acknowledge that in the course of my employment, as a prerequisite of employment with BakeMark, may be asked to submit to a random drug test and provide urine, blood or breath sample as part of a substance abuse screening. I hereby consent to such tests and also agree to allow BakeMark the right to make lawful searches of my work area and my vehicle while on company property, and other lawful surveillance activities, in an effort to keep the workplace drug free.

I authorize that the results of any drug test be communicated and disclosed to third parties. As a consequence of any positive result obtained by said test, I understand that any job offer may be rescinded, and if already employed by BakeMark I may be disciplined leading up to, or including, termination.

I hereby indemnify, release and forever discharge and hold BakeMark and its subsidiaries and affiliated companies, agents and employees harmless from any and all claims, demands, judgments and legal fees arising out of or in connection with such tests, the results, or any lawful use of the results.

Carolyn Pastis
_____
Employee's Name (Please Print)

DocuSigned by:
*Carolyn Pastis*
443BCC41E3F442F...
_____
Employee's Signature

1/25/2021
_____
Date

Rev. 04.11.18

# EXHIBIT 3

# NORTON ROSE FULBRIGHT

December 5, 2023

**Via Email and NLRB Online Portal**

Field Examiner Jesse J. Perona
National Labor Relations Board, Region 28
2600 North Central Avenue, Suite 1400
Phoenix, Arizona 85004-3099
Jesse.perona@nlrb.gov

Norton Rose Fulbright US LLP
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
United States of America

Jayesh Patel, Partner
jayesh.patel@nortonrosefulbright.com
Direct line: 213 892 9360

Tel +1 213 892 9200
Fax +1 213 892 9494
nortonrosefulbright.com

Re:    **BakeMark USA, LLC/Carolyn "Romy" Pastis**
       **Case 28-CA-322863**

Dear Ms. Perona:

We need your urgent assistance to address Ms. Pastis' conduct on social media that violates the National Labor Relations Act (the "Act"). *See Mclaren Macomb* (Feb. 21, 2023) 372 NLRB No. 58, at 8 (holding that employee communications that are "disloyal, reckless or maliciously untrue" are not protected by the Act).[1] Her conduct threatens severe financial consequences not just to BakeMark and its investor, but also to innocent retailers who purchase BakeMark products to make and sell baked goods to consumers. Ms. Pastis' conduct is maliciously defamatory and interferes with contractual relationships between BakeMark and its various customers and investors.

Ms. Pastis has posted the **same**, **two-year old,** false and defamatory photographs and accusations of "illegal" activity on LinkedIn, Facebook and Instagram by BakeMark and one of its investors. **Her posts make claims of ongoing illegal activity, five months after she left BakeMark's employment.** These claims are false, and the photographs and assertions have been rebutted twice, already, by public official inspections:[2]

   a)    In mid-2022 Ms. Pastis first submitted these photographs and claims to BakeMark, claiming "illegal" activity at that time. BakeMark requested an inspection by the Maricopa County Environmental Service Dept. Health Division and received an "A" rating in response to those claims (the Nov. 2022 report in Exhibit A). BakeMark received an "A" rating;

   b)    In 2023, Ms. Pastis, using the same photographs and claims, prompted yet another health inspection, at BakeMark's request, by the Maricopa County officials, again resulting in an "A" rating (the July 2023 report in Exhibit A).

---

[1] As you know we will be providing information and responsive documents on behalf of our client, BakeMark USA, LLC ("BakeMark" or the "Respondent") by December 7, 2023 in the above-captioned investigation into unfair labor practice allegations by Carolyn "Romy" Pastis (the "Charge").
[2] See Reports dated Nov. 2022 and July 2023, attached as , Exhibit A and Social Media posts attached as Exhibit B.

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

138240376.1

Jesse J. Perona
December 5, 2023
Page 2

NORTON ROSE FULBRIGHT

Now Ms. Pastis has recycled those exact same photographs, and exact same assertions of "illegal activity" into social media posts five months after she resigned her position at BakeMark.

**We request that the NLRB issue an order to Ms. Pastis ordering her to remove these defamatory and knowingly false social media posts immediately or provide actual, objective, reliable evidence to support her statement of claimed "illegalities" by the company and its investor**. If the NLRB is unable or unwilling to issue such an order, BakeMark will take appropriate legal steps to prevent Ms. Pastis' defamation from doing further harm.

We look forward to hearing from you promptly in this regard, so that we can avoid taking legal action against Ms. Pastis seeking immediate injunctive relief.  Thank you.

Very truly yours,

Jayesh Patel

JP/smc
Enclosures

138240376.1

# EXHIBIT 4



**Environmental Service Department**
**Environmental Health Division**

**Business Name:** Bakemark

**Permit Number:** FD-39055



11/8/2022

www.maricopa.gov



This award card is property of the Maricopa County Environmental Services Dept. Tampering or altering this card may result in legal action.



**Maricopa County**
**Environmental Services Department**
**Environmental Health Division**
**Food Inspection Report**

| | |
|---|---|
| Date: | 11/8/2022 |
| Start Time: | 10:26:00 AM |
| Permit ID: | FD-39055 |
| Expires: | 8/31/2022 |

**Purpose Routine Inspection**

| Business Name: | Bakemark | Address: | 2625 S Roosevelt St 101 Suite , Tempe, AZ 85282 |
|---|---|---|---|

**Terms:**

- PRIORITY VIOLATION is a major violation that directly contributes to increasing the risk of foodborne illness or injury.
- PRIORITY FOUNDATION VIOLATION is a minor violation that does not directly contribute to an increased risk of foodborne illness but failure to correct this violation may lead to the occurrence of a PRIORITY VIOLATION.
- CORE VIOLATION is a minor violation that relates to general maintenance and sanitation.

**Category 50 - Sewage & waste water properly disposed**

- Core-5-401.11, C: Capacity, Drainage...Mop sink is currently clogged. Operator stated drain is scheduled for service today. Directed operator to dispose of mop water in sanitary sewer through trough drain nearby. Do not dispose of wastewater to the storm drains or parking lot..

  **Correct Prior To Next Routine Inspection**

**General Comments:**

This establishment received an A Grade and had no Priority, no Priority Foundation and one Core violations on this inspection..
No County legal action will result from this inspection.
Emailed report to Leslie

## GENERAL PERMIT & INSPECTION INFORMATION

| | | | | |
|---|---|---|---|---|
| **Owner Name:** | Bakemark USA, LLC | **Permit Type:** | Food Jobber | Class 2 |
| **Mailing Address:** | 2625 S Roosevelt St., Ste 101 | **Permit Location:** | | |
| **Phone Number:** | 4808290886 | | | |
| **Food Manager Licenses:** | | **Award:** | A | |
| | | **Embargoed:** | | |

Status indicates whether the item was met during the evaluation.Key: IN = In Compliance   OUT = Not in Compliance   N/O = Not Observed   N/A = Not Applicable Foodborne Illness Risk factors are food preparation and employee behaviors most commonly reported to the Centers for Disease Control and Prevention (CDC) as contributing factors in foodborne illness outbreaks. The specific observations made in a category market 'OUT' can be found at the beginning of this report.

**Foodborne Illness Risk Factors:**

| | Status | Item | | Status | Item |
|---|---|---|---|---|---|
| 01 | In | Certification by accredited program, compliance with Code, or correct responses | 16 | N/A | Proper cooking time & temperatures |
| | | | 17 | N/A | Proper reheating procedures for hot holding |
| 02 | In | Management Awareness; policy present | 18 | N/A | Proper cooling time & temperatures |
| 03 | In | Proper use of reporting, restriction & exclusion | 19 | N/A | Proper hot holding temperatures |
| 04 | In | Proper eating, tasting, drinking, or tobacco use | 20 | In | Proper cold holding temperatures |
| 05 | In | No discharge from eyes, nose, and mouth | 21 | In | Proper date marking & disposition |
| 06 | In | Hands clean & properly washed | 22 | N/A | Time as a public health control: procedures & record |
| 07 | In | No bare hand contact with RTE foods or approved alternate method properly followed | 23 | N/A | Consumer advisory provided for raw or undercooked foods |
| 08 | In | Adequate hand washing facilities supplied & accessible | 24 | N/A | Pasteurized foods used; prohibited foods not offered |
| 09 | In | Food obtained from approved source | 25 | N/A | Food additives; approved and properly used |
| 10 | N/O | Food received at proper temperature | 26 | In | Toxic substances properly identified, stored, and used |
| 11 | In | Food in good condition safe, & unadulterated | 27 | N/A | Compliance with variance, specialized process, & HACCP plan |
| 12 | N/A | Required records available; shell stock tags, parasite destruction | | | |
| 13 | In | Food separated & protected | | | |
| 14 | In | Food-contact surfaces: cleaned & sanitized | | | |
| 15 | In | Proper disposition of returned, previously served, reconditioned & unsafe food | | | |

Based on this inspection, the issues/ items listed below identify violations of the Maricopa County Environmental Health Code and/or FDA 2013 Food Code. Failure to comply with the Code may result in permit suspension, permit revocation, Notice of Violation and Demand for Compliance, Cease and Desist, citation or referral to the County Attorney's Office. Priority items are required to be corrected within 3 days, Priority Foundation Items within 10 days, and Core items within 90 days unless otherwise noted on this inspection report. For additional compliance assistance, please contact the inspector listed below or their supervisor. If violations were noted on a previous inspection and have been corrected, legal enforcement action may already have been initiated and will continue. Violations found on any inspection may be used to determine a pattern of non-compliance.

**Received By:**

Leslie Walker

**Environmental Health Specialist:**

Kim Adams, RS/REHS
kim.adams@maricopa.gov

**Supervisor:**

Rebecca Calderon, RS
rebecca.calderon@maricopa.gov
602-372-3352



**Maricopa County**

Environmental Services Department



**41-1001.01. Regulatory bill of rights; small businesses**

A. To ensure fair and open regulation by state agencies, a person:

1. Is eligible for reimbursement of fees and other expenses if the person prevails by adjudication on the merits against an agency in a court proceeding regarding an agency decision as provided in section 12-348.
2. Is eligible for reimbursement of the person's costs and fees if the person prevails against any agency in an administrative hearing as provided in section 41-1007.
3. Is entitled to have an agency not charge the person a fee unless the fee for the specific activity is expressly authorized as provided in section 41-1008.
4. Is entitled to receive the information and notice regarding inspections and audits prescribed in section 41-1009.
5. May review the full text or summary of all rulemaking activity, the summary of substantive policy statements and the full text of executive orders in the register as provided in article 2 of this chapter.
6. May participate in the rulemaking process as described in articles 3, 4, 4.1 and 5 of this chapter, including:
   a) Providing written comments or testimony on proposed rules to an agency as provided in section 41-1023 and having the agency adequately address those comments as provided in section 41-1052, subsection D, including comments or testimony concerning the information contained in the economic, small business and consumer impact statement.
   b) Filing an early review petition with the governor's regulatory review council as provided in article 5 of this chapter.
   c) Providing written comments or testimony on rules to the governor's regulatory review council during the mandatory sixty-day comment period as provided in article 5 of this chapter.
7. Is entitled to have an agency not base a licensing decision in whole or in part on licensing conditions or requirements that are not specifically authorized by statute, rule or state tribal gaming compact as provided in section 41-1030, subsection B.
8. Is entitled to have an agency not make a rule under a specific grant of rulemaking authority that exceeds the subject matter areas listed in the specific statute or not make a rule under a general grant of rulemaking authority to supplement a general grant of rulemaking authority as provided in section 41-1030, subsection C.
9. May allege that an existing agency practice or substantive policy statement constitutes a rule and have that agency practice or substantive policy statement declared void because the practice or substantive policy statement constitutes a rule as provided in section 41-1033.
10. May file a complaint with the administrative rules oversight committee concerning:
    a) A rule's, practice's or substantive policy statement's lack of conformity with statute or legislative intent as provided in section 41-1047.
    b) An existing statute, rule, practice alleged to constitute a rule or substantive policy statement that is alleged to be duplicative or onerous as provided in section 41-1048.
11. May have the person's administrative hearing on contested cases and appealable agency actions heard by an independent administrative law judge as provided in articles 6 and 10 of this chapter.
12. May have administrative hearings governed by uniform administrative appeal procedures as provided in articles 6 and 10 of this chapter and may appeal a final administrative decision by filing a notice of appeal pursuant to title 12, chapter 7, article 6.
13. May have an agency approve or deny the person's license application within a predetermined period of time as provided in article 7.1 of this chapter.
14. Is entitled to receive written notice from an agency on denial of a license application:
    a) That justifies the denial with references to the statutes or rules on which the denial is based as provided in section 41-1076.
    b) That explains the applicant's right to appeal the denial as provided in section 41-1076.
15. Is entitled to receive information regarding the license application process before or at the time the person obtains an application for a license as provided in sections 41-1001.02 and 41-1079.
16. May receive public notice and participate in the adoption or amendment of agreements to delegate agency functions, powers or duties to political subdivisions as provided in section 41-1026.01 and article 8 of this chapter.
17. May inspect all rules and substantive policy statements of an agency, including a directory of documents, in the office of the agency director as provided in section 41-1091.
18. May file a complaint with the office of the ombudsman citizens' aide to investigate administrative acts of agencies as provided in chapter 8, article 5 of this title.
19. Unless specifically authorized by statute, may expect state agencies to avoid duplication of other laws that do not enhance regulatory clarity and to avoid dual permitting to the extent practicable as prescribed in section 41-1002.
20. May have the person's administrative hearing on contested cases pursuant to title 23, chapter 2 or 4 heard by an  independent administrative law judge as prescribed by title 23, chapter 2 or 4.
21. Pursuant to section 41-1009, subsection E, may correct deficiencies identified during an inspection unless otherwise provided by law.

B. The enumeration of the rights listed in subsection A of this section does not grant any additional rights that are not prescribed in the sections referenced in subsection A of this section.

C. Each state agency that conducts audits, inspections or other regulatory enforcement actions pursuant to section 41-1009 shall create and clearly post on the agency's website a small business bill of rights. The agency shall create the small business bill of rights by selecting the applicable rights prescribed in this section and section 41- 1009 and any other agency-specific statutes and rules. The agency shall provide a written document of the small business bill of rights to the authorized on-site representative of the regulated small business. In addition to the rights listed in this section and section 41- 1009, the agency notice of the small business bill of rights shall include the process by which a small business may file a complaint with the agency employees who are designated to assist members of the public or regulated community pursuant to section 41-1006. The notice must provide the contact information of the agency's designated employees. The agency notice must also state that if the regulated person has already made a reasonable effort with the agency to resolve the problem and still has not been successful, the regulated person may contact the office of ombudsman-citizens aide.

If you have business related questions, such as permit fees or mailing addresses, please contact the Administrative Services Office at (602) 506-6824.

If you have an issue that you cannot resolve with the Environmental Services Department, you may contact the Maricopa County Ombudsman Office.

Ombudsman@mail.maricopa.gov

Your administrative hearing rights can be found in A.R.S. § 41-1092 et seq., and rights relating to appeal of a final agency decision can be found in A.R.S. § 12-901et seq.



**Environmental Service Department**

Environmental Health Division

## Did You Know?

Inspection reports are placed on a 72 hour hold before they are published to the Department's website.

If you have any questions about your inspection or did not receive a copy of your report, take advantage of this time period to follow-up with us.

Contact Details:    Rebecca Calderon, RS
rebecca.calderon@maricopa.gov
602-372-3352

How are we doing    Go to the following url to complete a brief survey.
https://apps.env.maricopa.gov/FoodInspectionSurvey/?SRID=23



Inspection Date:    11/8/2022



**Environmental Service Department**

**Environmental Health Division**

**Business Name:** Bakemark

**Permit Number:** FD-39055



7/24/2023

www.maricopa.gov



This award card is property of the Maricopa County Environmental Services Dept. Tampering or altering this card may result in legal action.



Maricopa County
Environmental Services Department
Environmental Health Division
Food Inspection Report

Date: 7/24/2023
Start Time: 10:24:00 AM
Permit ID: FD-39055
Expires: 8/31/2024

**Purpose Routine Inspection**

---

**Business Name:    Bakemark**          **Address:   2625 S Roosevelt St 101 Suite , Tempe, AZ 85282**

---

**Terms:**

- PRIORITY VIOLATION is a major violation that directly contributes to increasing the risk of foodborne illness or injury.

- PRIORITY FOUNDATION VIOLATION is a minor violation that does not directly contribute to an increased risk of foodborne illness but failure to correct this violation may lead to the occurrence of a PRIORITY VIOLATION.

- CORE VIOLATION is a minor violation that relates to general maintenance and sanitation.

---

**General Comments:**

This establishment received an A Grade and had 0 Priority, 0 Priority Foundation violations on this inspection.

Of Note:
- The Environmental Services Department will begin emailing permit card(s) and permit invoice(s) to permittees in the coming months. We need a current and accurate email address on file to ensure you receive a copy of your permit card and invoice(s) upon renewal. If you are unsure whether your email address is accurate, you may:

• Contact your inspector using the phone number or email on your last inspection report to review, or

• Contact the Department using the email addresses below –

o Envquickservicerestaurants@maricopa.gov (facilities such as fast-food)
o Envfullservicerestaurants@maricopa.gov (facilities that are full-service restaurants)
o Envretailgrocery@maricopa.gov (facilities like grocery stores or retail food markets)
o Envspecialtyprograms@maricopa.gov (mobile food/special events/plan review)

Note: If you need to update your email address and/or other contact information, please submit an administrative change request form at the below website https://www.maricopa.gov/FormCenter/Environmental-Services-16/Administrative-Change-Request-Form-181 or call 602-506-6824.

Report e-mailed.
No County legal action will result from this inspection.

## *GENERAL PERMIT & INSPECTION INFORMATION*

| | | | | |
|---|---|---|---|---|
| **Owner Name:** | Bakemark USA, LLC | **Permit Type:** | Food Jobber | Class 2 |
| **Mailing Address:** | 2625 S Roosevelt St., Ste 101 | **Permit Location:** | | |
| **Phone Number:** | 4808290886 | | | |
| **Food Manager Licenses:** | | **Award:** | A | |
| | | **Embargoed:** | | |

Status indicates whether the item was met during the evaluation.Key: IN = In Compliance   OUT = Not in Compliance   N/O = Not Observed   N/A = Not Applicable Foodborne Illness Risk factors are food preparation and employee behaviors most commonly reported to the Centers for Disease Control and Prevention (CDC) as contributing factors in foodborne illness outbreaks. The specific observations made in a category market 'OUT' can be found at the beginning of this report.

#### Foodborne Illness Risk Factors:

| | Status | Item | | Status | Item |
|---|---|---|---|---|---|
| 01 | In | Certification by accredited program, compliance with Code, or correct responses | 16 | N/A | Proper cooking time & temperatures |
| | | | 17 | N/A | Proper reheating procedures for hot holding |
| 02 | In | Management Awareness; policy present | 18 | N/O | Proper cooling time & temperatures |
| 03 | In | Proper use of reporting, restriction & exclusion | 19 | N/A | Proper hot holding temperatures |
| 04 | In | Proper eating, tasting, drinking, or tobacco use | 20 | In | Proper cold holding temperatures |
| 05 | In | No discharge from eyes, nose, and mouth | 21 | In | Proper date marking & disposition |
| 06 | In | Hands clean & properly washed | 22 | N/A | Time as a public health control: procedures & record |
| 07 | In | No bare hand contact with RTE foods or approved alternate method properly followed | 23 | N/A | Consumer advisory provided for raw or undercooked foods |
| 08 | In | Adequate hand washing facilities supplied & accessible | 24 | N/A | Pasteurized foods used; prohibited foods not offered |
| 09 | In | Food obtained from approved source | 25 | N/A | Food additives; approved and properly used |
| 10 | N/O | Food received at proper temperature | 26 | In | Toxic substances properly identified, stored, and used |
| 11 | In | Food in good condition safe, & unadulterated | 27 | N/A | Compliance with variance, specialized process, & HACCP plan |
| 12 | N/A | Required records available; shell stock tags, parasite destruction | | | |
| 13 | In | Food separated & protected | | | |
| 14 | In | Food-contact surfaces: cleaned & sanitized | | | |
| 15 | In | Proper disposition of returned, previously served, reconditioned & unsafe food | | | |

Based on this inspection, the issues/ items listed below identify violations of the Maricopa County Environmental Health Code and/or FDA 2013 Food Code.  Failure to comply with the Code may result in permit suspension, permit revocation, Notice of Violation and Demand for Compliance, Cease and Desist, citation or referral to the County Attorney's Office. Priority items are required to be corrected within 3 days, Priority Foundation Items within 10 days, and Core items within 90 days unless otherwise noted on this inspection report. For additional compliance assistance, please contact the inspector listed below or their supervisor. If violations were noted on a previous inspection and have been corrected, legal enforcement action may already have been initiated and will continue. Violations found on any inspection may be used to determine a pattern of non-compliance.

**Received By:**

Brian N.

**Environmental Health Specialist:**

Sarah Reimus
(602) 402-2035
sarah.reimus@maricopa.gov

**Supervisor:**

Colton Rasen
(602) 372-3357
colton.rasen@maricopa.gov



**Maricopa County**

**Environmental Services Department**

**41-1001.01. Regulatory bill of rights; small businesses**

A. To ensure fair and open regulation by state agencies, a person:

1. Is eligible for reimbursement of fees and other expenses if the person prevails by adjudication on the merits against an agency in a court proceeding regarding an agency decision as provided in section 12-348.
2. Is eligible for reimbursement of the person's costs and fees if the person prevails against any agency in an administrative hearing as provided in section 41-1007.
3. Is entitled to have an agency not charge the person a fee unless the fee for the specific activity is expressly authorized as provided in section 41-1008.
4. Is entitled to receive the information and notice regarding inspections and audits prescribed in section 41-1009.
5. May review the full text or summary of all rulemaking activity, the summary of substantive policy statements and the full text of executive orders in the register as provided in article 2 of this chapter.
6. May participate in the rulemaking process as provided in articles 3, 4, 4.1 and 5 of this chapter, including:
   a) Providing written comments or testimony on proposed rules to an agency as provided in section 41-1023 and having the agency adequately address those comments as provided in section 41-1052, subsection D, including comments or testimony concerning the information contained in the economic, small business and consumer impact statement.
   b) Filing an early review petition with the governor's regulatory review council as provided in article 5 of this chapter.
   c) Providing written comments or testimony on rules to the governor's regulatory review council during the mandatory sixty-day comment period as provided in article 5 of this chapter.
7. Is entitled to have an agency not base a licensing decision in whole or in part on licensing conditions or requirements that are not specifically authorized by statute, rule or state tribal gaming compact as provided in section 41-1030, subsection B.
8. Is entitled to have an agency not make a rule under a specific grant of rulemaking authority that exceeds the subject matter areas listed in the specific statute or not make a rule under a general grant of rulemaking authority to supplement a more specific grant of rulemaking authority as provided in section 41-1030, subsection C.
9. May allege that an existing agency practice or substantive policy statement constitutes a rule and have that agency practice or substantive policy statement declared void because the practice or substantive policy statement constitutes a rule as provided in section 41-1033.
10. May file a complaint with the administrative rules oversight committee concerning:
    a) A rule's, practice's or substantive policy statement's lack of conformity with statute or legislative intent as provided in section 41-1047.
    b) An existing statute, rule, practice alleged to constitute a rule or substantive policy statement that is alleged to be duplicative or onerous as provided in section 41-1048.
11. May have the person's administrative hearing on contested cases and appealable agency actions heard by an independent administrative law judge as provided in articles 6 and 10 of this chapter.
12. May have administrative hearings governed by uniform administrative appeal procedures as provided in articles 6 and 10 of this chapter and may appeal a final administrative decision by filing a notice of appeal pursuant to title 12, chapter 7, article 6.
13. May have an agency approve or deny the person's license application within a predetermined period of time as provided in article 7.1 of this chapter.
14. Is entitled to receive written notice from an agency on denial of a license application:
    a) That justifies the denial with references to the statutes or rules on which the denial is based as provided in section 41-1076.
    b) That explains the applicant's right to appeal the denial as provided in section 41-1076.
15. Is entitled to receive information regarding the license application process before or at the time the person obtains an application for a license as provided in sections 41-1001.02 and 41-1079.
16. May receive public notice and participate in the adoption or amendment of agreements to delegate agency functions, powers or duties to political subdivisions as provided in section 41-1026.01 and article 8 of this chapter.

17. May inspect all rules and substantive policy statements of an agency, including a directory of documents, in the office of the agency director as provided in section 41-1091.
18. May file a complaint with the office of the ombudsman citizens' aide to investigate administrative acts of agencies as provided in chapter 8, article 5 of this title.
19. Unless specifically authorized by statute, may expect state agencies to avoid duplication of other laws that do not enhance regulatory clarity and to avoid dual permitting to the extent practicable as prescribed in section 41-1002. ·
20. May have the person's administrative hearing on contested cases pursuant to title 23, chapter 2 or 4 heard by an independent administrative law judge as prescribed by title 23, chapter 2 or 4.
21. Pursuant to section 41-1009, subsection E, may correct deficiencies identified during an inspection unless otherwise provided by law.

B. The enumeration of the rights listed in subsection A of this section does not grant any additional rights that are not prescribed in the sections referenced in subsection A of this section.

C. Each state agency that conducts audits, inspections or other regulatory enforcement actions pursuant to section 41-1009 shall create and clearly post on the agency's website a small business bill of rights. The agency shall create the small business bill of rights by selecting the applicable rights prescribed in this section and section 41- 1009 and any other agency-specific statutes and rules. The agency shall provide a written document of the small business bill of rights to the authorized on-site representative of the regulated small business. In addition to the rights listed in this section and section 41- 1009, the agency notice of the small business bill of rights shall include the process by which a small business may file a complaint with the agency employees who are designated to assist members of the public or regulated community pursuant to section 41-1006. The notice must provide the contact information of the agency's designated employees. The agency notice must also state that if the regulated person has already made a reasonable effort with the agency to resolve the problem and still has not been successful, the regulated person may contact the office of ombudsman-citizens aide.

If you have business related questions, such as permit fees or mailing addresses, please contact the Administrative Services Office at (602) 506-6824.

If you have an issue that you cannot resolve with the Environmental Services Department, you may contact the Maricopa County Ombudsman Office.

Ombudsman@mail.maricopa.gov

Your administrative hearing rights can be found in A.R.S. § 41-1092 et seq., and rights relating to appeal of a final agency decision can be found in A.R.S. § 12-901et seq.



# Environmental Service Department

Environmental Health Division

## Did You Know?

Inspection reports are placed on a 72 hour hold before they are published to the Department's website.

If you have any questions about your inspection or did not receive a copy of your report, take advantage of this time period to follow-up with us.

Contact Details:    Colton Rasen
(602) 372-3357
colton.rasen@maricopa.gov

How are we doing    Go to the following url to complete a brief survey.
https://apps.env.maricopa.gov/FoodInspectionSurvey/?SRID=23



Inspection Date:    7/24/2023

EXHIBIT 5

UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**

REGION 28
2600 North Central Avenue -Suite 1400
Phoenix, AZ 85004-3099

Agency Website: www.nlrb.gov
Telephone: (602)640-2160
Fax: (602)640-2178

Agent's Direct Dial: (602)416-4750

November 22, 2023

Phillip Di Tullio, Esquire
Norton Rose Fulbright
555 South Flower Street Suite 4100
Los Angeles, CA 90071-2417

Re:    BakeMark USA, LLC
          Case 28-CA-322863

Dear Mr. Di Tullio:

I am writing this letter to advise you that it is now necessary for me to take evidence from your client regarding the investigation of the above-referenced matter. Set forth below are the allegations and issues on which your evidence is needed, a request to take affidavits, a request for documentary evidence, and the date for providing your evidence.

**Allegations:**  Charging Party Caroline Pastis (Charging Party) alleges that BakeMark USA, LLC (the Employer) violated Section 8(a)(1) and (4) of the National Labor Relations Act (the Act) by threatening legal action against employees, interrogating employees, issuing discipline pursuant to overly broad rules and in response to protected activity, and constructively discharging her because she engaged in protected, concerted activity and/or because she filed charges or participated in the Board's processes.

The Charging Party alleges that the Employer threatened legal action against her by sending her attorney a letter dated February 14, 2023, from the Employer's attorney, Jayesh Patel, stating in part:

"The attached LinkedIn posting by your client has been seen by various persons at BakeMark. It is factually incorrect and we believe was made as part of an ongoing pattern of your client's expression of her dissatisfaction with her employment. First, since BakeMark has heard no mention of any of this information in any form prior to this post, we demand that your client immediately remove it. We reserve our rights as to the consequences that this posting may have caused and may still cause. In addition, please provide us with any factual information on which your client made this posting to address our concerns that she may have made defamatory remarks without any basis."

Attorney Patel also sent two separate letters dated February 22, 2023 to Charging Party's attorney that state in part:

BakeMark USA, LLC                          - 2 -                          November 22, 2023
Case 28-CA-322863

"Thank you for having your client remove the social media post. We still await her factual substantiation for it."

and

"As a reminder, we still await her factual substantiation for her now deleted social media post."

Charging Party also alleges that she was retaliated against because she filed the charge in 28-CA-309585 on December 27, 2022 which was served on the Employer on December 29, 2022.

Additionally, the investigation disclosed that Charging Party was issued a written on about February 27, 2023, in part, because of her LinkedIn social media postings, which, as the Employer asserts, violated its Social Media Policy. This, among her other protected activities, and because she filed the charge in 28-CA-309585, are the basis of Charging Party's allegation that she was issued discipline pursuant to overly broad rules and in response to protected activity.

The investigation also shows that attorney Patel's letter dated February 14, 2023, to Charging Party's attorney, also states in part:

"Given your client's ongoing conduct at her place of employment, if she wishes to tender her resignation in writing, we will accept it. BakeMark's efforts in addressing her various issues have, so far, apparently not received any positive results."

Attorney Patel sent two separate letters dated February 22, 2023, to Charging Party's attorney that state in part:

"BakeMark has made every effort to rehabilitate the conduct of your client to return her to the collaborative, productive employee she once was—which the company still hopes for notwithstanding her actions. Nevertheless, since Ms. Pastis seems to have a continued dissatisfaction with her workplace, if her desire is to leave BakeMark we may be able to persuade the company to accept a $10,000 separation and a release of all claims."

and

"As to resolution, since Ms. Pastis seems to have a continued dissatisfaction with her workplace, if her desire is to leave BakeMark, we are authorized to offer a $5,000 separation amount, with an additional payment of actual attorney's fees not to exceed $12,500 in exchange for a release of all claims."

BakeMark USA, LLC                                    - 3 -                           November 22, 2023
Case 28-CA-322863

The investigation also shows that the Employer's Handbook contains provisions that may violate Section 8(a)(1) of the Act, including the following.

At p. iv:

**BAKEMARK ADHERES TO THE POLICY OF EMPLOYMENT-AT-WILL, WHICH MEANS THAT EITHER BAKEMARK OR THE EMPLOYEE IS FREE TO TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE. NO SUPERVISOR OR MANAGER OF BAKEMARK, OTHER THAN THE PRESIDENT IN A DOCUMENT DATED AND SIGNED BY THE PRESIDENT WHICH SPECIFIES A DEFINED TERM OF EMPLOYMENT FOR A SPECIFICALLY NAMED EMPLOYEE, HAS ANY AUTHORITY TO ENTER INTO ANY AGREEMENT WHICH ALTERS THIS "AT WILL" EMPLOYMENT RELATIONSHIP. EVEN THOUGH EMPLOYEES MAY RECEIVE COMMENDATIONS, PAY RAISES, BONUSES, GOOD PERFORMANCE EVALUATIONS, AND THE LIKE DURING THEIR EMPLOYMENT, THIS "AT-WILL" EMPLOYMENT RELATIONSHIP WILL NEVER CHANGE.**

Neither the policies contained in this Handbook, nor any other written or verbal communication by a Manager, are intended to create a contract of employment or a warranty of benefits. The policies contained in this Handbook are guidelines only. They may be added to, deleted, changed, or modified by BakeMark at its sole discretion, except that its "employment at-will" employment policy will never be modified.

At p. 24:

**Social Media Policy**

<u>Be Respectful.</u> Always be fair and courteous to fellow associates, customers, members, suppliers or people who work on behalf of BakeMark. Also, keep in mind that you are more likely to resolve work-related complaints by speaking directly with your co-workers or by utilizing our Open Door Policy than by posting complaints to a social media outlet. Nevertheless, if you decide to post complaints or criticism, avoid using statements, photographs, video or audio that reasonably could be viewed as malicious, obscene, threatening or intimidating, that disparage customers, members, associates or suppliers, or that might constitute harassment or bullying. Examples of such conduct might include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, sex, disability, religion or any other status protected by federal, state or local law or company policy.

     <u>Confidentiality/Trade Secrets.</u> Maintain the confidentiality of BakeMark trade secrets and private or confidential information. Trades secrets may include information regarding the development of systems, processes, products, know-how and technology. Do not post internal reports, policies, procedures or other internal business-related confidential communications.

     **Board Affidavits:** I am requesting to take affidavits from Vice President Michael Beasley, Assistant General Manager Liza Salcedo, General Manager Tyler Nielsen, and any other individuals you believe have information relevant to the investigation of this matter. Please be advised that the failure to present representatives who would appear to have information relevant to the investigation of this matter, for the purposes of my taking sworn statements from them, constitutes less than complete cooperation in the investigation of the charge. Please contact me by **Tuesday, November 28, 2023**, to schedule these affidavits.

     **Documents:** Please provide the following documents, along with any and all other evidence you deem to be relevant to the case:

1. Documents, including, but not limited to, memoranda, letters, personnel records, emails, text messages, and notes, related to the final written warning of Charging Party.

2. Documents, including, but not limited to, memoranda, letters, personnel records, emails, text messages, and notes, prepared and/or obtained during the course of the investigation that led to the final written warning of Charging Party.

3. Documents and other materials relied on by the Employer in deciding to issue the final written warning to Charging Party.

4. Page 232 of the Exhibits to the Position Statement in 28-CA-309585 shows two LinkedIn postings by the Charging Party. Please provide the following information about those postings:

   ▪ Who found the postings and on which date?

   ▪ How did the Employer discover the postings?

   ▪ Were the postings made public to anyone on the LinkedIn platform?

   ▪ Does the Employer have a practice of monitoring employees' social media postings? If so, please provide evidence that shows that it has monitored employees' social media postings in the past two years.

   ▪ Why were both LinkedIn postings screenshot by the Employer?

BakeMark USA, LLC                        - 5 -                        November 22, 2023
Case 28-CA-322863

5.  Please provide documents, including, but not limited to, memoranda, letters, personnel records, emails, text messages, and notes, related to the Charging Party's LinkedIn postings.

6.  Since the Charging Party's February 27, 2023 final written warning states that Charging Party's LinkedIn postings violate its Social Media Policy, please provide your position on whether the Charging Party's final written warning violates the Act pursuant to *Continental Group, Inc.,* 357 NLRB 403 (2011).

7.  Documents, including, but not limited to, memoranda, letters, personnel records, emails, text messages, and notes, related to the charge that Charging Party filed in 28-CA-309585.

8.  Documents that show that employees have been disciplined for the same or similar reason in the past two years.

9.  The Charging Party alleges that she was constructively discharged because of her protected concerted and Board activities.  Please provide documentation, including, but not limited to, memoranda, letters, personnel records, emails, text messages, and notes, related to the circumstances that led to Charging Party ending her employment.

10. Please provide your position on whether the above described Employee Handbook provisions violate Section 8(a)(1) of the Act.

11. Please provide your position on whether attorney Patel's February 14 and 22, 2023 letters to Charging Party's attorney are threats of legal action for Charging Party engaging in protected concerted and Board activity.

12. Did the Charging Party or her attorney offer for Charging Party to resign her employment for a separation amount?  If so, please provide evidence that shows that they did, and the date that they made the offer.  If not, please provide your position on whether the February 14 and 22, 2023 letters are invitations for Charging Party to quit her employment in response to protected concerted and Board activity.

BakeMark USA, LLC                          - 6 -                        November 22, 2023
Case 28-CA-322863

13. The charge in 28-CA-309585 alleges that in about late December 2022, the Employer prohibited Charging Party from telecommuting twice per week. Your Position Statement in 28-CA-309585 states that, as COVID-related restrictions eased, the Employer reinstituted a company-wide policy requiring all employees to work 5 days a week on location at the branch office. This policy was applied equally to all employees in the Tempe branch. Please provide documents and evidence that shows that the Employer issued a company-wide policy and that it was applied to all employees in the Tempe branch.

14. A position statement, along with any other evidence you wish to present.

**Preservation of documents and electronically stored information (ESI):** This letter also serves to remind you of your client's obligation to preserve all documents and ESI pertinent to this matter and to take all steps necessary to avoid the inadvertent loss of information in the possession, custody, or control of the Employer. Pertinent ESI includes all electronic communications concerning the substance of this matter, including text messages, e-mails, instant messaging from any platform, or other forms of communication or electronic documents regardless of whether those communications occurred on personal or business devices.

**Date for Submitting Evidence:** To resolve this matter as expeditiously as possible, you must provide your evidence and position in this matter by **Friday, December 1, 2023**. If you are willing to allow me to take affidavits, please contact me by **Tuesday, November 28, 2023,** to schedule a time to take affidavits. Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov). You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible. Failure to comply with Section 102.5 will result in rejection of your submission. The Region will make its determination on the merits solely based on the evidence properly submitted.

Please contact me at your earliest convenience by telephone, (602)416-4750, or e-mail, jesse.perona@nlrb.gov, so that we can discuss how you would like to provide evidence and I can answer any questions you have with regard to the issues in this matter.

Very truly yours,

*/s/ Jesse J. Perona*
Field Examiner

# EXHIBIT 6



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

Agency Website: www.nlrb.gov
REGION 28                                    Telephone: (602) 640-2160
2600 North Central Avenue -Suite 1400       Fax: (602) 640-2178
Phoenix, AZ 85004-3099 (Region)             Agent's Direct Dial: (602) 416-4752

February 7, 2023

**VIA E-MAIL**
BakeMark USA, LLC
ATTN: Rosemarie Gomez, Director of Human Resources
2625 South Roosevelt Street, Suite 101
Tempe, Arizona 85282
(480) 829-0886
rosemarie.gomez@bakemark.com

        Re:  Bake Mark, USA, LLC (Employer)
            Case 28-CA-309585

Dear Ms. Gomez:

    I am writing this letter to advise you that it is now necessary for me to take evidence from you regarding the allegations raised in the investigation of the above-referenced matter.  Set forth in this letter are the allegations and issues, which evidence is needed, including affidavits, documents, and date to provide the evidence.

    **Allegations:**  The allegations for which I am seeking your evidence are as follows:

(1) The Charging Party has presented evidence that the Employer, during the past six (6) months has violated Section 8(a)(1) of the Act by disciplining employee(s), including Carolyn "Romy" Pastis and subjecting her to discrimination because she engaged in protected concerted activities.  Specifically, Ms. Pastis alleges that the Employer took the following adverse actions because she raised concerted complaints to the Employer concerning unethical business practices affecting employees; employee bonuses; and/or the lack of COVID related safety protocols including providing notifications to employees about exposure:

    (a) About October 2022, the Employer separated or isolated Ms. Pastis from other employees by requiring her to vacate her office and use office space away from others;

    (b) About late December 2022, the Employer issued written discipline to Ms. Pastis; and

    (c) About late December 2022, the Employer prohibited Ms. Pastis from telecommuting twice per week.

BakeMark USA, LLC                              - 2 -                          February 7, 2023
Case 28-CA-309585

(2)   For the last six months, the Employer has promulgated and/or maintained the
following overly broad and/or discriminatory provisions in its Employee Handbook,
as follows:

**CODE OF BUSINESS ETHICS & CONDUCT**

(a) "…Furthermore, we require that all Employees understand and comply with
our values and policies…"

(b) "Employees shall report suspected internal or external irregularities to their
Manager or, if they consider reporting to their Manager inappropriate, to the
Human Resource Department at…"

(c) "Any employee who has reason to believe that a violation of this policy has
occurred, or may occur, must promptly report this information to his or her
supervisor, the next level of supervision, or a member of the executive team."

**HUMAN RESOURCES AMINISTRATION**

(d) "…If you have an idea or issue, you should take the following steps:

    1. Discuss the idea or situation thoroughly with your immediate Supervisor.

    2. If the response from your Supervisor is not satisfactory, contact your manager or
    functional executive for a response.

    3. If the situation is not resolved, or if you feel you cannot go to your immediate
    Supervisor or manager with your problem, contact the Corporate Human
    Resources Department.

    4. If the problem cannot be resolved at any of the previous levels, you may contact
    the Company President."

(e) "…If you experience or witness any conduct that you feel may be inconsistent with
this policy, BakeMark encourages and expects you to immediately notify the local
Branch General Manager or Director of Human Resources…Please take every
step you can to make sure that your concern is known to management…"

**UNACCEPTABLE JOB PERFORMACE – DISCIPLINARY ACTION**

(f) "…In the event that a performance problem arises, your Supervisor or Manager
will deal with it in a manner designed to correct the problem and prevent its
recurrence…By providing the examples above, BakeMark in no way restricts its
discretion to discipline Employees or immediately terminate the employment
relationship…"

**WORK RULES and EXPECTATIONS**

(g) "Whenever people gather together to achieve goals, some rules of conduct are needed to
help everyone work together efficiently, effectively and harmoniously…"

BakeMark USA, LLC                        - 3 -                    February 7, 2023
Case 28-CA-309585

**Employee Responsibilities**

(h) "…Refrain from behavior or conduct deemed offensive, or unacceptable, or which is subject to disciplinary action.

**Unacceptable Activities**

(i) "…BakeMark expects Employees to follow rules that will protect the interests and safety of all Employees and BakeMark…"

(j) "… Violation of BakeMark rules, as set forth in this Handbook or elsewhere…."

(k) "… Violation of BakeMark rules and any other actions that are obviously detrimental to efforts to operate profitably…"

(l) "… providing information about your Employees to other persons or organizations or any other breach of confidentiality of personnel information…"

**Social Media Policy**

(m)"…Keep in mind that any of your conduct that adversely affects your job performance, the performance of fellow associates or otherwise adversely affects members, customers, suppliers, people who work on behalf of BakeMark or BakeMark's legitimate business interests may result in disciplinary action up to and including termination…"

(n) "…Proven violation or breach of the confidentiality agreement may be cause for immediate termination…"

**Board Affidavits:**  I am requesting to take the following affidavits from:  **Leslie "Les" Walker**, General Manager for Tempe Location, **Dan Hagerman**, Tempe Branch Manager, **Rosemarie Gomez**, HR Director, **Brian Nogle**, Operations Manager, **Haja Perry**, Tempe Branch Supervisor and any other individuals you believe may have information relevant to the investigation of the above-captioned matter.  Please be advised that failure to present representatives who would appear to have information relevant to the investigation of this matter, for the purposes of my taking sworn statements from them, constitutes less than complete cooperation in the investigation of the charge.  Please contact me by **February 21, 2023**, to schedule these affidavit(s).

**Documents:**  Please further provide the following documents, along with all other evidence you deem to be relevant to the case:

1. From January 1, 2021, until December 31, 2022, documents, including, but not limited to, policy/procedure manuals, and/or notices to employees, showing policies, work rules and/or procedures maintained by the Employer related to insubordination of all workplace information.

BakeMark USA, LLC                              - 4 -                         February 7, 2023
Case 28-CA-309585

2.  From January 1, 2021, until December 31, 2022, job description(s) for Carolyn "Romy" Pastis (Romy).

3.  All internal documents, including emails, notes and texts, reflecting the Employer's reasons for disciplining Romy in December 2022.

4.  All internal documents, including emails, notes and texts, reflecting the Employer's reasons for moving Romy's office space around October 2022.

5.  All internal documents, including emails, notes and texts, reflecting the Employer's reasons for prohibiting Romy from telecommuting, beginning around December 2022

6.  Copies of any discipline given to Romy, including documents, emails, notes, and texts which reflect the reasons for issuing that discipline.

7.  Documents, emails, notes, and texts reflecting Romy's performance history while employed by the Employer.

8.  Excluding medical information, copy of Romy's Employee Personnel file.

9.  Documents reflecting incidents where the Employer has disciplined (informal or formal) other employees for the same or similar reasons that it disciplined Romy.

10. To the extent the Employer contends that Romy was disciplined for conduct or performance related reasons, documents, emails, notes, and texts reflecting her conduct or performance that were considered by the Employer.

11. From January 1, 2021, until present, copies of any recordings of conversations between Rosemarie Gomez and Romy or any other management personnel and Romy.

12. From January 1, 2021, until December 31, 2022, copies of any general complaints or grievances filed by Romy regarding Romy's discipline or any other issues including the issues subject to her alleged concerted complaints as referenced above.

13. A statement of position regarding the issues presented in this case, including but not limited to any relevant case law that the Employer is relying upon in support of its position.

14. Any other documents you believe are relevant to the investigation.

   **Date for Submitting Evidence:**  To resolve this matter as expeditiously as possible, you must provide your evidence and position in this matter by **February 24, 2023**.  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by

BakeMark USA, LLC                          - 5 -                          February 7, 2023
Case 28-CA-309585

electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.  Failure to comply with Section 102.5 will result in rejection of your submission. The Region will make its determination on the merits solely based on the evidence properly submitted.

      You may contact me at your earliest convenience by telephone, (602) 416-4752, or e-mail, katherine.king-walker@nlrb.gov, for further inquiries regarding the issues in this matter.

                Sincerely,


                */s/ Katherine T. King-Walker*
                Katherine T. King-Walker
                Field Attorney