**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BakeMark USA LLC, | No. CV-23-02674-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn Pastis, et al., | |
| Defendants. | |

This request for a Preliminary Injunction follows the Court's prior hearing and entry of a Temporary Restraining Order ("TRO"). (Doc. 20.) Plaintiff submitted a Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction. (Doc. 32.) On February 15, 2024, the Court held a Preliminary Injunction hearing. The Court has now considered the pleadings, testimony, exhibits from the hearing, relevant case law, and arguments of counsel and will grant the Preliminary Injunction.

**I.   BACKGROUND**

Plaintiff is a national company that manufactures and sells a variety of baking products, ingredients, and supplies. (Doc. 1 at 2.) Defendant was previously employed as a Senior Buyer at Plaintiff's Tempe facility. (*Id.*) In this position, she was made privy to some of Plaintiff's customers, customer base, and other confidential company information. (*Id.* at 4, 10.) Before beginning her job, Defendant was required to sign an employment agreement ("the Agreement"). (*Id.* at 4, 34–38.)

The Agreement contained several confidentiality provisions and a return of

materials provision. (*Id.* at 34–38.) The Agreement prohibits the disclosure of "confidential information" which is defined as "trade secrets (as defined by applicable law) or other confidential and proprietary information relating to the Company's customers, manufacturing, products, services, pricing and sales, research, business, practices [or] procedures . . . that Employee becomes privy to by virtue of employment with [BakeMark]." (*Id.* at 4, 35.) This definition includes "(ii) information about [BakeMark's] internal methods of operation and manufacturing . . . " and "(iii) information about the companies . . . practices and strategies . . . [BakeMark's] suppliers . . . ; and non-published financial information relating to [BakeMark's] income, budgeting, cost structures, expenses, profits, and general financial standing." (*Id.*)

In May 2022, Defendant sent a report to BakeMark management detailing several allegations about the operations of the Tempe branch and her co-workers. (*Id.* at 5.) In this report, Defendant alleged that (1) Plaintiff was keeping goods in storage beyond their expiration dates and selling them to customers, and (2) that Plaintiff was selling products that showed signs of pests on the exterior of the packaging. (*Id.* at 5–6.) In response, Plaintiff requested an inspection by the Maricopa County Environmental Service Department's Health Division. (*Id.* at 6.) After the inspection, Maricopa County issued Plaintiff an "A" rating in response to the claims. (*Id.*) Plaintiff shared the results with Defendant and explained to her the falsity of those allegations with information and relevant standards. (*Id.*)

Defendant subsequently made similar claims, prompting another health inspection at Plaintiff's request. (*Id.* at 7.) Plaintiff also conducted its own internal investigation. (*Id.*) Neither Maricopa County's investigation nor Plaintiff's internal investigation turned up any evidence of Defendant's claims, and Plaintiff received another "A" rating from Maricopa County. (*Id.*) In February 2023, Defendant published her first accusations detailing "illegal" company activity to her LinkedIn profile. (*Id.* at 8.) In this first post, she accused Plaintiff of "cook[ing] the books" and "forg[ing] legal documents" and accompanied her accusation with "#legal #fraud #forgery Federal Bureau of Investigations

(FBI) Clearlake Capital Group." (*Id.*) On February 14, 2023, Plaintiff demanded that Defendant remove the post, which after three days she agreed to do. (*Id.*)

On July 17, 2023, Defendant resigned from her position. (*Id.* at 9.) However, on November 30, 2023, Defendant began posting more allegations on LinkedIn. (*Id.*) She first posted that Plaintiff sells "infested" product and claimed that the photos she posted along with her allegations "[didn't] even scratch the surface of the documentation [she] [has]!" (*Id.*) Later that same day, Defendant posted an alleged recounting of her interactions with Plaintiff and Clearlake Capital Group ("Clearlake"), one of Plaintiff's investors. (*Id.*) In the post, she repeated her allegations and stated again that Plaintiff was shipping "insect-infested truckloads." (*Id.*) Defendant posted one final time that day, this time alleging that Plaintiff "mishandle[s] and misrepresent[s] inventory to a pathological degree," and "routinely commit[s] rampant inventory and accounting fraud." (*Id.* at 9–10.) This final post also repeated the claim that Plaintiff ships "infested inventory," resulting in "multiple truckloads" of returns and that Plaintiff refuses to throw away "expired" inventory. (*Id.*)

On December 14, 2023, Defendant published a post on Facebook, tagging Krispy Kreme Doughnuts and Clearlake. (*Id.* at 10.) In this post, Defendant published images claiming to show Plaintiff's allegedly infested products. (*Id.*) In a separate post on the same day, Defendant claimed that Plaintiff "illegally" refused to "track fumigation" of product apparently sold to Krispy Kreme and posted images of internal communications she had with her former fellow employees. (*Id.* at 11.)

Plaintiff contends that at all times, Defendant was aware through her knowledge gained as a Senior Buyer and through the shared investigation results that her accusations were false. (*Id.*) Plaintiff therefore sought a TRO to enjoin Defendant from continuing to broadcast these allegations.

On January 12, 2023, the Court held a TRO hearing, for which Defendant failed to appear. After the hearing, the Court issued a TRO, enjoining Defendant from various activities—including keeping her offending social media posts active or posting any

- 3 -

1 additional BakeMark information. (Doc. 20 at 8–9.)

2 After entry of the TRO, Defendant did not immediately remove the social media posts. On February 14, 2024, Plaintiff filed an Ex Parte Motion for an Order to Show Cause Why Defendant Should Not Be Held in Civil Contempt. (Doc. 31.) In this Motion and at the Preliminary Injunction Hearing, Plaintiff alleged that Defendant had not removed any social media posts in violation of the TRO. In response, the Court set a contempt hearing for February 23. 2024. However, on February 15, 2024, the Court received notice that Defendant had removed the offending social media posts. (Doc. 35.) In response, the Court vacated the contempt hearing. (Doc. 36.)

## II.   LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. The analysis for granting a TRO is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Cochran v. Rollins*, No. CV 07-1714-PHX-MHM (JRI), 2008 WL 3891578, at *1 (D. Ariz. Aug. 20, 2008). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted))); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v.*

*Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.

## III. DISCUSSION

There was very little discussion at the hearing regarding Plaintiffs' likelihood of success on the merits of the claims.  Defendant also did not directly address the merits of the claim.  Rather, Defendant presented arguments and exhibits primarily focused on her argument that she will succeed on the merits.  The Court has considered the admitted exhibits and Plaintiff's written objections to Defendant's exhibits 17 and 18.  (Doc. 37.)  The Court will analyze the claims as alleged.

### A. Likelihood of Success on the Merits

#### i. Defamation Per Se

Under Arizona law, there are three elements of a defamation claim: "(1) defendant made a false defamatory statement about plaintiff, (2) defendant published the statement to a third party, and (3) defendant knew the statement was false, acted in reckless disregard of whether the statement was true or false, or negligently failed to ascertain the truth or falsity of the statement."  *Farrell v. Hitchin' Post Trailer Ranch*, No. 1 CA-CV 11-0011, 2011 WL 6057930, at *2 (Ariz. Ct. App. Dec. 6, 2011) (citing *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977)).  "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation."  *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989).  "Under Arizona law, a statement is defamatory per se when the defamatory character of the statement is apparent on its face; that is, when the words used are 'of such a nature that the court can presume as a matter of law that the communication will tend to degrade or disgrace the party defamed.'"  *McKnight v. McKnight*, No. CV-20-01956-PHX-DWL, 2021 WL 4133970, at *4 (D. Ariz. Sept. 10, 2021) (quoting *McClinton v. Rice*, 265 P.2d 425, 429–30 (Ariz. 1953)).

Plaintiff has presented evidence that Defendant's claims regarding contaminated product were investigated internally as well as by third parties. Through these investigations, Defendant's allegations were deemed meritless. The results of the investigations were shared with Defendant; therefore she knew her complaints were unfounded. During cross-examination, Plaintiff stated that she does not accept the results of these investigations. However, not accepting the results as true does not change the results. And despite these results, Defendant published those same allegations on social media. Defendant also admitted that some of her posts accused Plaintiff of committing accounting fraud. She made these accusations even though she admits, and exhibit 13 shows, that she is not an accountant. This exhibit also shows that she has no training or experience with pest control. These accusations likely constitute defamation per se. *See Hawks v. Seery*, No. CV-21-00092-PHX-DGC, 2023 WL 5206135, at *8–9 (D. Ariz. Aug. 14, 2023). The Court finds Plaintiff has shown a likelihood of success on the merits of the defamation claim.

   *ii.     Breach of Contract*

Under Arizona law, a claim for breach of contract has three elements: (1) the existence of a contract between the plaintiff and defendant; (2) a breach of the contract by defendant; and (3) resulting damage to the plaintiff. *Frank Lloyd Wright Found. v. Kroeter*, 697 F. Supp. 2d 1118, 1125 (D. Ariz. 2010).

Here, Plaintiff alleges Defendant breached her employment agreement, specifically, the confidentiality provision, when she posted confidential information on social media. The confidentiality provision of her employment reads as follows: "Employee shall hold Confidential Information . . . in the strictest confidence and shall not, without the prior written authorization of an authorized Company officer, or as required by law, disclose Confidential Information in any manner to any person, or use Confidential Information in any way, other than in the furtherance of Employee's duties during his/her employment with the Company." (Doc. 1 at 34.) "Confidential Information" is defined, in part, to include "trade secrets . . . or other confidential and proprietary information relating to the

Company's customers, manufacturing, products, services, pricing and sales, research, business practices, procedures or Baking Products not generally known by or available to the public that Employee becomes privy to by virtue of employment with the Company." (*Id.* at 35.)

As discussed above, Defendant posted confidential information about customers, internal communications, internal policies, and company operations. That alone likely constitutes breach. Although that content has been removed from social media, Defendant could still repost that information, or post new information, during the pendency of this litigation. Defendant presented screenshots of various internal company emails and spreadsheets at the hearing. (*See* Ex. 17; 18.) However, Plaintiff objected to these exhibits and presented information that the exhibits constitute incomplete information. These exhibits also do not address Defendant's specific allegations. Therefore, the Court will not consider these exhibits. The Court finds there is a likelihood of success on the breach of contract claim.

### B. Irreparable Harm

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance. Demonstrating irreparable harm is not an easy burden to fulfill." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (internal quotation marks and citation omitted); *see also Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1131 (D. Colo. 2018). However, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841.

Here, Defendant published false information that is clearly likely to harm the goodwill of a company providing food supplies. She also admitted to keeping and publishing confidential information about Plaintiff's customers that is likely to harm its

business relationships. The exhibits show that she has more of this information in her possession. (*See* Ex.17; 18.) Moreover, these posts cause irreparable harm, and any further similar posts will have the same result. A preliminary injunction is necessary to prevent Plaintiff from suffering any further irreparable harm. In sum, the Court finds there is a likelihood of irreparable harm if a preliminary injunction is not issued.

### C. Balance of Equities

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980))). No harm will befall Defendant if the preliminary injunction continues to preclude her from posting false, disproven and confidential information. At the hearing, Defendant mentioned her ongoing National Labor Relations Board ("NLRB") action against Plaintiff. This preliminary injunction will not impact that action. Moreover, Plaintiff concedes that Defendant's agreement with BakeMark permits her to utilize confidential information in connection with her NLRB proceedings. (Doc. 32 at 20.) But with the risk that Defendant shares more information on social media, Plaintiff will continue to endure harm to its goodwill and reputation. The balance of equities weigh in favor of granting the preliminary injunction.

### D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "Courts have held that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006). The possibility of Defendant posting

further false statements on social media while this litigation is pending is a continuing threat to Plaintiff's rights. Moreover, the injunction is also narrowly tailored as it only prevents demonstrably false statements and disclosure of confidential information. Public policy weighs in favor of issuing the preliminary injunction.

## IV.   CONCLUSION

For the reasons discussed above,

**IT IS HEREBY ORDERED** that for the pendency of this case:

1. Defendant, her agents, servants, employees, attorneys, and all those persons in active concert or participation with them are enjoined and restrained from:
   a. Publishing any and all BakeMark information about its customers, customer contracts, investors or any other confidential business information;
   b. Allowing to remain published on social media any materials making statements, accusations, allegations, or implications that BakeMark sells contaminated or adulterated food (the "Defamatory Words") published before the issuance of this order;
   c. Re-publishing or publishing anew the Defamatory Words;
   d. Contacting any individual, business, enterprise or other such entity that Defendant knows or suspects is affiliated with or has a relationship with BakeMark, commercial or otherwise, in order to attempt to abrogate, cancel, terminate, or otherwise alter its relationship with BakeMark, to BakeMark's detriment, except in connection with legitimate commercial activity, such as, but not limited to, attempting to make sales to that customer on the behalf of a competitor to BakeMark, as may be permitted by any applicable agreements between Defendant and BakeMark; and,
   e. Conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (b) above.

2. Consistent with paragraph (1) above, Defendant is ordered to remove from display, to the extent possible, any of her publications containing the Defamatory Words, including on all internet web pages.

**IT IS FURTHER ORDERED** that Defendant shall continue to preserve all originals and copies of hard copy and electronic evidence, including but not limited to all disks, personal data assistants, hard drives, virtual hard drives, online storage and other electronic storage devices in his possession, custody, or control to which she had or has access and on which relevant information may currently or have previously existed.

**IT IS FURTHER ORDERED** that Plaintiff shall serve this Order on Defendant as soon as practicable.

Dated this 27th day of February, 2024.

_____
Honorable Susan M. Brnovich
United States District Judge